BANK OF NOVA SCOTIA v.
SAN MIGUEL.

No. 4575.

United States Court of Appeals
First Circuit.

May 14, 1952.

Henri Brown, San Juan, P. R., Brown, Newsom & Cordova, San Juan, P. R. (Enrique Cordova Diaz, San Juan, P. R., on brief), for appellant.

Herbert S. McConnell, San Juan, P. R. (Benicio Sanchez Castano, San Juan, P. R., on brief), for appellee.

Before MAGRUDER, Chief Judge, and MARIS and WOODBURY, Circuit Judges.

MARIS, Circuit Judge.

This is an appeal by the plaintiff, The Bank of Nova Scotia, a Canadian corporation, from a judgment of the United States District Court for the District of Puerto Rico entered upon a verdict for the defendant, Marcelino San Miguel, a citizen and resident of Puerto Rico. The litigation grew out of the following transactions:

Prior to July 31, 1947 the defendant had obtained an order to sell and ship to Jacob J. Salama & Company of Tangier, Morocco, 2,000 metric tons of Dominican sugar for $7.75 per 100 pounds. Salama had arranged through the Banco Hispano Americano in Tangier with The Chase National Bank of the City of New York to give to the defendant a letter of credit to cover the cost of the sugar thus purchased. A confirmed, irrevocable letter of credit was issued to the defendant by the Chase National Bank on July 31, 1947. By the letter as subsequently amended the Chase

National Bank undertook, up to $345,000, to honor the defendant's sight drafts if presented at the office of the bank in New York on or before October 20, 1947 and if accompanied by the following commercial documents: a commercial invoice in quadruplicate, a certificate of origin, a weight certificate issued by Superintendency, a certificate of quality issued by Superintendency stating quality same as sample in possession of Superintendency, and a full set of bills of lading dated on or before October 15, 1947 to the order of Banco Hispano Americano, Tangier, marked to notify Industrial Commercial Espanola, S. A., showing Melilla as port of destination in transit for Spanish Morocco, evidencing a single shipment of 2,000 metric tons of crude sugar 96/97 degrees polarization at $7.75 per 100 pounds, f. o. b. vessel Dominican ports.

The defendant had arranged with Compania Antillana de Importacion y Exportacion C. por A., a Dominican corporation of which the defendant was president, to purchase in the Dominican Republic the raw sugar needed to meet his contract with Salama. The defendant had discussed with the plaintiff's Trujillo City branch the financing of these purchases and by a letter dated August 5, 1947 requested the plaintiff to advance to Compania Antillana against delivery of the warehouse receipts the sum of $208,600 with which to purchase the sugar and such additional sums as might be needed to pay production taxes, commissions and exportation permit fees and other expenses necessary for the transportation to and embarkation of the sugar at the Dominican ports. On the same day the defendant endorsed in blank and delivered to the plaintiff's San Juan branch his letter of credit from the Chase National Bank with instructions that it be sent to its Trujillo City branch and "should be handled under the strictest confidence and for exclusive use of the internal management of your bank."

Under date of August 8, 1947, plaintiff's Trujillo City branch acknowledged receipt of the defendant's letter of August 5th and of the letter of credit, and informed him it was authorized to grant loans to the company up to $215,000 against promissory notes to be issued by Compania Antillana. A continuing letter of guaranty in which the defendant personally guaranteed repayment was enclosed for the defendant's signature. The letter of guaranty was signed by the defendant and delivered as requested to the plaintiff. Subsequently advances were made by the plaintiff's Trujillo City branch to Compania Antillana as needed for the purchase of the sugar and the other expenses involved. Compania Antillana gave its note to the plaintiff for each advance and as security delivered to the plaintiff warehouse receipts for the sugar thus purchased. The total amount advanced by the plaintiff to Compania Antillana was $307,800.

The sugar was loaded on board a vessel bound for Spanish Morocco early in October, 1947. On the 10th of that month the plaintiff's Trujillo City branch forwarded to the defendant in New York a form of commercial invoice for the sugar to be copied on his own forms, signed and returned and a form of draft in its favor on the Chase National Bank as drawee for $341,713, the total purchase price of the sugar loaded, to be signed by him and returned to the plaintiff so that, to quote from the plaintiff's letter, "we may liquidate the loans made by reason of this sugar shipment." The defendant immediately signed and returned the invoice in quadruplicate and the draft in duplicate to the plaintiff at Trujillo City. The plaintiff thereupon inserted the date, October 15, 1947, in the draft, discounted it and applied the proceeds as follows: $307,800 in reimbursement of the advances made by it to Compania Antillana, $2,749.70 in payment to itself of interest on said advances at 8%, $1,560.55 in payment to itself of exchange charges upon the draft, and remitted the balance of $29,602.75 by check to the defendant in New York. At the same time the plaintiff cancelled and returned to Compania Antillana the promissory notes evidencing the advances.

Prior to October 15, 1947 the plaintiff's Trujillo City branch and Compania Antillana had been collaborating in securing the commercial documents which the letter of

credit, issued by the Chase National Bank and then in the possession of the plaintiff's Trujillo City branch, required to accompany drafts drawn thereunder. The draft was presented by the plaintiff to the Chase National Bank in New York for acceptance and payment on October 20, 1947, the final day stipulated in the letter of credit for such presentation. The draft was accompanied by the commercial documents which the plaintiff and Compania Antillana had obtained. The Chase National Bank, however, refused to accept or pay the draft upon the ground that the accompanying documents did not comply with the requirements of the letter of credit and returned the draft to the plaintiff at about 4:30 P. M. that day.

The defendant was in New York at that time and after telephone conversations between the defendant, officers of the Chase National Bank and officers of the plaintiff's branch in New York the draft and accompanying documents were returned just before 5 P. M. on the same day to the Chase National Bank in order that it might secure authorization to accept the draft. The draft was again returned by the Chase National Bank to the plaintiff in New York on November 7, 1947 with a letter which disclosed the discrepancies between the documents submitted and the requirements stipulated in the letter of credit, as follows:

"1. Certificate of export authority presented instead of certificate of origin.

"2. Agent's certificate presented instead of Superintendency certificate.

"3. Agent's certificate is qualified by last paragraph.

"4. Agent's certificate specifies 'sample *compares* favorable with sample handed to inspector'. Letter of Credit stipulates 'certificate to state quality *same as* sample in possession of Superintendency'.

"5. Agent's certificate specifies 'Quisqueya 97.17 Colon 97.47 polarization'. Letter of Credit stipulates '96/97 degrees polarization'."

The draft was formally protested by the plaintiff on January 20, 1948.

Salama refused to accept the sugar upon its arrival in Melilla and it was stored in a warehouse there. In order to minimize the loss which obviously might result from this situation the plaintiff in December, 1947 sent a representative to Tangier to negotiate with Salama. It appeared that the defects in the documents accompanying the draft were of a technical nature and such as could be corrected, the sugar being in fact equal to or better than sample. However, the sugar market had dropped in the interim and Salama refused to go through with the purchase on the original basis. After some negotiations Salama finally accepted the sugar at the reduced price of $256,713, $85,000 less than the price originally agreed upon. Pursuant to a prior agreement between the plaintiff, the defendant and Compania Antillana, solely for the purpose of minimizing damages and without waiving any of their rights or defenses, the sum of $256,713 thus realized on June 2, 1948 from the sale of the sugar was paid to and retained by the plaintiff in reduction of its claims arising out of these transactions. In effecting this settlement with Salama the plaintiff incurred expenses of $13,465.16.

On June 22, 1949, the plaintiff brought the present civil action against the defendant in which two causes of action were alleged. The first cause of action was for the recovery of the amounts advanced by the plaintiff to Compania Antillana at the defendant's request amounting to $307,800, with interest of $15,583.83, a total of $323,-383.83, against which the plaintiff credited the sum of $213,655.09, being the amount it had recovered from Salama less its expenses of $13,455.16 and its payment of $29,602.75 to the defendant. The net amount claimed under the first cause of action was $109,728.74 with interest. This cause of action was based upon the theory that Compania Antillana was the defendant's agent in the transactions involving the advances from the plaintiff, that the defendant was accordingly legally liable to the plaintiff for the repayment of those advances and that the receipt by the plaintiff of the draft drawn by the defendant on the Chase National Bank in its favor did not

operate as payment of those advances in view of the subsequent dishonor of the draft by the drawee, the Chase National Bank. The plaintiff chose not to base its cause of action upon the letter of continuing guaranty which the defendant had given it in connection with the advances to Compania Antillana.

The second cause of action asserted in the complaint was for the recovery of the amount of the draft which the plaintiff had discounted at the instance of the defendant and which the drawee, the Chase National Bank, had dishonored. The claim was for $341,713, the amount of the draft, plus interest of $25,614.24, upon which the plaintiff credited the net proceeds, amounting to $243,257.84, of the final sale of the sugar to Salama, making the net claim under this cause of action $124,069.40 with interest. This cause of action was based upon the asserted liability of the defendant as drawer of the draft to the plaintiff as payee upon the dishonor of the draft. Since the draft was a foreign bill of exchange and its dishonor had not been timely protested, the plaintiff alleged that the protest of the draft had been lawfully waived by the defendant.

The defendant filed an answer to both causes of action, together with a counterclaim. As to the first cause of action he denied that Compania Antillana was his agent in obtaining from the plaintiff the advances which were the basis of that cause. As an affirmative defense he alleged the following: Before accepting the proposal of Salama for the purchase of the sugar in question the plaintiff agreed through its Trujillo City branch to take full charge of the drawing of the drafts under the letter of credit and to supervise the preparation and procuring of all documents which might be required under the letter of credit to accompany the draft. Relying on this undertaking by the plaintiff he obtained the letter of credit, made arrangements with Compania Antillana for the purchase of the sugar in the Dominican Republic, requested the plaintiff to make the necessary advances to Compania Antillana for this purpose to be evidenced by notes of Compania Antillana and to be se-

cured by pledge of the sugar so purchased, delivered to the plaintiff his continuing letter of guaranty up to $215,000 and as collateral security assigned and delivered the letter of credit to the plaintiff.

The defendant further alleged that the plaintiff negligently and imprudently released the sugar in question from pledge by delivery of the same to Compania Antillana for shipment to Salama without having ascertained whether it was of the quality and appearance called for by the letter of credit and without having obtained the documents required to accompany the draft, that thereafter the plaintiff negligently and imprudently accepted as complying with the provisions of the letter of credit documents which did not comply therewith, that thereupon the plaintiff prepared a form of draft under the letter of credit which it forwarded to the defendant, who was then in New York, for his signature, that the defendant believing that the plaintiff had obtained the documents called for in the letter of credit to accompany the draft and that they complied with the requirements of the said letter of credit signed and returned the draft which the plaintiff thereupon discounted by the payment to itself from the proceeds thereof of the amount of its advances to Compania Antillana plus interest and exchange charges, remitting the balance of $29,602.75 to the defendant, at the same time cancelling and returning to Compania Antillana its promissory notes evidencing the said advances, and that thereafter on October 20, 1947 plaintiff presented the said draft and accompanying documents to the Chase National Bank but that acceptance and payment of the draft was refused for the reason that the accompanying documents did not comply with the letter of credit. Finally defendant asserts that under the applicable law of the Dominican Republic he was not under these circumstances liable to the plaintiff on the first cause of action.

In defense to the second cause of action the defendant denied that the plaintiff was induced by reason of any agreement, request, conduct or statement of the defendant not to protest the draft. As an affirmative defense to this cause of action the

defendant repeated his allegations with respect to his agreement with the plaintiff as to the undertaking by it to supervise the preparation and procuring of the commercial documents required under the letter of credit to accompany the draft and its negligent and imprudent failure to carry out its obligations in this regard resulting in the dishonor of the draft, and he alleged that under the applicable law of the Dominican Republic he was not liable to the plaintiff upon its second cause of action because of the plaintiff's negligence in connection with the documents accompanying the draft, and because of its failure to timely protest the dishonor of the draft and further that the cause of action was barred by the applicable statute of limitations.

The defendant's counterclaim sought reimbursement for his legal and other expenses incurred as a result of the plaintiff's failure properly to prepare and obtain the commercial documents required under the letter of credit.

The case was tried to a jury. The trial was long, the issues of fact many and involved. The jury rendered a verdict for the defendant upon both causes of action but did not find for the defendant on his counterclaim. The plaintiff has taken the present appeal from the judgment entered on the verdict. It contends on this appeal that the trial judge erred (1) in refusing to charge the jury that the letter of credit had not been assigned or pledged to the plaintiff; (2) in charging that the second cause of action was barred if the endorsement and delivery of the letter by defendant was an assignment and constituted a provision of funds; (3) in refusing to instruct the jury that the effect of the words and conduct of the defendant in New York on October 20, 1947 constituted a waiver of protest and was governed by the law of New York; (4) in charging that if the conversations between officers of the plaintiff, the defendant and officers of the Chase National Bank on October 20, 1947 amounted to a request that the Chase National

Bank be given additional time to pay the draft which the Chase National Bank returned on November 7, 1947 and the plaintiff did not protest the draft until January 20, 1948, the jury should find for the defendant on the second cause of action; and (5) in not granting plaintiff's request for a special verdict. We accordingly turn to the consideration of these contentions.

As to the first cause of action, plaintiff's sole contention is that the trial judge erred in refusing to charge the jury as a matter of law that the letter of credit had not been assigned to plaintiff by defendant. It argues that the letter of credit by its terms required an assignment of it to be in the form of a letter of assignment. The letter of credit, however, did not require that assignments be in the form of a letter of assignment but required that if it should be assigned by the defendant to a third party, any draft presented by the assignee for payment under the letter of credit must be accompanied by the defendant's letter of assignment.[1] Since the draft was not drawn by the plaintiff but by the defendant at the plaintiff's request, this particular requirement of the letter of credit never came into play. In any event it was a condition imposed by the Chase National Bank for its own benefit and, therefore, can have no effect on the rights of the plaintiff and defendant as between themselves. There was ample evidence from which the jury could find that the letter of credit was assigned and pledged by the defendant to the plaintiff as collateral security for the advances made. Accordingly the trial judge did not err in refusing to charge as requested. This being the only error alleged with respect to the first cause of action the verdict must stand as to that cause of action.

We turn then to consider the alleged errors in the trial judge's charge with respect to the second cause of action. The first error alleged, and the only one which we need consider in detail, is the instruction that the second cause of action was

---

1. The letter of credit provided as follows: "Should this credit be assigned by you to * * * another party all drafts presented to us must be accompanied by your letter of assignment, and our commission charge of ⅛ of 1% is to be paid to us by you at the time of such actual assignment."

barred by the applicable statute of limitations if the endorsement and delivery of the letter of credit by the defendant to the plaintiff was found by the jury to be an assignment thereof and to constitute a provision of funds for the payment of the draft. The trial judge evidently based this instruction upon the conclusion that the second cause of action arose in the Dominican Republic, that by Section 49 of the Puerto Rico Code of Civil Procedure [2]— the Puerto Rico borrowing statute—the statute of limitations of the Dominican Republic appropriate to the cause of action was to be applied and that the appropriate Dominican statute required the plaintiff to sue upon its cause of action upon the draft within three months after its date of maturity whether or not protest was waived, if the defendant had made provision of funds for the payment of the draft.

In this case of diverse citizenship the Puerto Rico statute of limitations is to be applied by the federal district court.[3] The Puerto Rico borrowing statute of limitations, as we have seen, directs the application of the relevant statute of limitations of the country where the cause of action arose. A cause of action in contract arises at the place where the defendant is obligated to perform and fails to do so. We think that the trial judge rightly concluded that the plaintiff's cause of action as holder of the draft against the defendant as drawer arose in the Dominican Republic where the draft was delivered by the defendant to the plaintiff. For it is the well settled rule that the drawer of a bill of exchange does not contract to pay the money in the foreign place on which it is drawn, but only guarantees its acceptance and payment in that place by the drawee, and agrees, in default of such payment, upon due notice, to reimburse the holder at the place where he entered into the contract.[4] We have been referred to no case in which the Supreme Court of Puerto Rico has held to the contrary. We accordingly conclude that this general rule is in force in Puerto Rico and furnishes the appropriate rule of conflict of laws to be applied in the case before us. It follows that in this case the Puerto Rico borrowing statute requires the application of the appropriate statute of limitations of the Dominican Republic. The testimony of the expert witnesses on Dominican law was to the effect that this statutory limitation was to be found in Articles 161, 162, 166, 168, 170 and 189 of the Code of Commerce of the Dominican Republic.[5]

Upon examining these articles of the Dominican Code it appears that in case of the refusal by the drawee to pay a

2. "Section 49.—(361 Cal.) When a cause of action has arisen in a State or Territory of the United States, or in a foreign country, and by the laws thereof an action thereon cannot be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against him in Puerto Rico, except in favor of one who has been a citizen of said Island, and who has held the cause of action from the time it accrued."

3. Guaranty Trust Co. v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079; Ragan v. Merchants Transfer & Warehouse Co., 1949, 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520.

4. Amsinck v. Rogers, 1907, 189 N.Y. 252, 82 N.E. 134, 12 L.R.A.,N.S., 875; Swift & Co. v. Bankers Trust Co., 1939, 280 N.Y. 135, 19 N.E.2d 992; 8 Am.Jur., Bills and Notes, § 521; 10 C.J.S., Bills and Notes, § 61b; 2 Daniel, Negotiable Instruments, 7th Ed., § 1051. See Musson v. Lake, 4 How 262, 277, 1846, 45 U.S. 262, 277, 11 L.Ed. 967.

5. "Article 161—The holder of a bill of exchange must demand payment thereof on the date of its maturity.

"Article 162—The refusal to pay must be made of record on the day following its maturity by an act called *protest for non-payment.* * * *

\*     \*     \*     \*     \*

"Article 166—Upon protest of domestic bills of exchange payable in Haiti, in any of the Antilles or in the United States of North America, the drawers and indorsers residing in the Republic, must be sued within the term of three months. * * *

\*     \*     \*     \*     \*

"Article 168.—Upon the expiration of the terms above set forth, for presentation of the bill of exchange at sight, or at one or many days or months or sight at usance; for protest for non-payment; for institution of action for guaranty; the holder of the bill will lose all right against the indorsers.

\*     \*     \*     \*     \*

Dominican bill of exchange payable in the United States suit against the drawer by the holder must be brought within the term of three months after protest if the drawer resides in the Dominican Republic and has provided funds for the payment of the bill as of the time of its maturity. This was the construction put upon the Code articles by the defendant's expert witness on Dominican law and we accept it as did the trial judge.[6] The expert witness also testified that in a case in which protest has been waived the Dominican law nonetheless requires suit under the circumstances indicated to be brought within three months after the maturity of the bill. This also we accept.

Another hurdle, however, remains to be passed before it can be held that this Dominican statute of limitations would bar a suit on the plaintiff's second cause of action. This is the question whether the defendant resides in the Dominican Republic within the meaning of Article 166. For if he does not the three months limitation of that statute which in terms applies only to residents of the Dominican Republic cannot apply to this case. Up to this point there is no serious disagreement between the parties as to the Dominican law but here they do emphatically disagree, the

plaintiff asserting that the defendant is not a resident of the Dominican Republic within the meaning of Article 166 and the defendant contending that he is such a resident. The basis for the defendant's assertion that although actually residing in Puerto Rico he is to be regarded as a resident of the Dominican Republic for the purposes of Article 166 is the Dominican Decree of June 7, 1905, as amended by Act No. 259 of May 2, 1940.[7] This statute, it will be seen, makes a person doing business in the Dominican Republic through any kind of establishment or through a representative subject to its laws and provides that his domicile or place of business shall, for the exercise of such jurisdiction, be his principal establishment or the office of his representative in the Republic.

It is the defendant's contention that this statute which provides a Dominican domicile for a person doing business in the Republic must be read as a gloss on Article 166 so as to bring within the scope of the latter section a person who although not actually residing in the Dominican Republic has a domicile or place of business therein for the purpose of the exercise of jurisdiction over him by the Dominican courts. The defendant's contention, in other words, is that Article 166 applies to

"Article 170.—The holder and the indorsers, in respect of the drawer himself, incur the same caducity, if the last proves that he had provided funds as of the time of the maturity of the bill of exchange. In this case the holder has no action except against the party against whom the bill was drawn.
* ⁂ ⁂ * *
"Article 189.—All actions relating to bills of exchange and bearer promissory notes, subscribed by dealers, merchants or bankers, or as a result of acts of commerce, shall prescribe after five years, counted from the day of protest or from the last judicial proceeding in the event there has been no judgment, or if the debt has not been acknowledged in a separate instrument. Nevertheless the presumed debtors shall be under the obligation, in the event demand is made upon them, to state under oath, that they are no longer debtors; and their widows, heirs or representatives that they believe in good faith that nothing is any longer owing."

The foregoing English translation of the Spanish text is by the official interpreter and translator of the District Court.

6. This question, though commonly stated to be one of fact, was for the trial judge, not the jury, to decide. Jansson v. Swedish American Line, 1 Cir.1950, 185 F.2d 212, 216.

7. "All persons, natural or juridical, individuals or an association, whatever may be their by-laws who do business in the Republic through any kind of establishment or through a representative, are subject to the laws of the nation. Therefore his or its domicile or place of business shall be the principal establishment he or it has or the office of his or its representative in each jurisdiction of the Republic."
The foregoing English translation of the Spanish text is by the official interpreter and translator of the District Court.

a drawer of a bill of exchange who by virtue of the provisions of the Decree of 1905, as amended by the Act of 1940, is subject to suit in the Dominican Republic and is in that sense deemed to be residing there.

This interesting question, which was much discussed by the expert witnesses on Dominican law called by the parties, we need not decide, however, since the defendant has wholly failed to show that he has been and is doing business in the Dominican Republic either through an establishment or a representative. He denied both in his pleadings and testimony that Compania Antillana was his agent in the sugar purchase transactions in the Dominican Republic which are here involved and he offered no evidence whatever that he had any other representative in the Dominican Republic or that he had there any kind of establishment or place of business of his own. He has accordingly not shown that he is a resident of the Dominican Republic within the meaning of Article 166 and as such entitled to the benefit of the limitation prescribed by that statute. Accordingly it would seem that the prescription of five years fixed by Article 189 of the Dominican Code of Commerce should have been applied. That period not having passed, it was error for the trial judge to charge the jury that the second cause of action was barred by the Dominican law if they found that the defendant, through the assignment of the letter of credit, had made provision of funds to meet the draft at its maturity.

It follows that the verdict must be set aside and the judgment reversed as to the second cause of action and that cause remanded to the district court for a new trial. This being so it becomes unnecessary to rule upon the other errors alleged by the plaintiff with respect to the trial judge's charge as to the second cause of action. But since the matters referred to therein will have to be given consideration upon another trial it will be useful to refer to them briefly.

██ The law of the Dominican Republic, as we have seen, requires that a bill of exchange which is dishonored by the drawee must be protested by the holder if he is to have recourse against the drawer when the latter has provided funds for its payment. The testimony of the expert witnesses on Dominican law made it clear that obtaining a confirmed, irrevocable letter of credit against which a draft may be drawn is a method of making provision of funds for its payment which is recognized under that law.[8] The defendant having shown that he had thus provided funds, the plaintiff sought to avoid the effect of its failure promptly to protest the draft by asserting that the conversations had between the parties on October 20, 1947 amounted to a waiver of protest by the defendant. In

---

8. It would appear that Article 170 of the Dominican Code of Commerce, which makes it necessary for a drawer to show that he has provided funds for the payment of the draft at the time of its maturity in order to rely on the failure of the holder to protest the nonpayment of the draft by the drawee, is analogous to Sections 114 and 159 of the Negotiable Instruments Law, Puerto Rico Code of Commerce, §§ 467, 512, which operate to deprive the drawer of a draft of the defense that it was not protested for nonpayment if it appears that he "has no right to expect or require that the drawee or acceptor will honor the instrument." The duty would seem to be to make provision that funds will be in the hands of the drawee on the date of presentment for payment. Having done this by securing from the drawee a confirmed, irrevocable letter of credit authorizing the drawing of the draft against it, accompanied by specified commercial documents, it would appear that the defendant had complied with his duty under the Dominican law to provide funds for the payment of the draft as of the time of its maturity. This being so it would appear that the question whether the letter of credit was assigned to the plaintiff is immaterial. It was not the duty of the defendant under the Dominican law to provide funds to the plaintiff but only to make arrangements for funds to be in the drawee's hands to meet the draft when the plaintiff presented it. This he did and the dishonor was not for lack of funds but because the accompanying commercial documents were not in proper form.

this connection it contends that the trial judge erred in refusing to instruct the jury that the question of whether there was such a waiver was to be governed by the law of New York, where the presentation took place. We see no error here. On the contrary it seems clear that the accepted rule [9] of conflict of laws on this point in Puerto Rico as elsewhere is that laid down in Amsinck v. Rogers, 1907, 189 N.Y. 252, 257–258, 82 N.E. 134, 136, 12 L.R.A.,N.S., 875, as follows:

> "While as to certain details, such as the days of grace, the manner of making the protest, and the person by whom protest shall be made, the law or custom of the place where it is payable will govern, the necessity of making a demand and protest and the circumstances under which the same may be required or dispensed with are incidents of the original contract which are governed by the law of the place where the bill is drawn, rather than of the place where it is payable."

Accordingly it was the law of the Dominican Republic which was to be applied in determining whether and under what circumstances protest was required to enable the plaintiff to have recourse against the defendant as drawer and whether and under what circumstances such protest might be waived. Moreover, the experts testified that although the Dominican law required a protest in order to hold the drawer unless the latter had not made provision of funds, nonetheless such protest might be waived by the drawer.[10]

From the evidence the jury might have found that the defendant agreed to a request by the drawee, the Chase National Bank, for the representment to it of the draft on October 20, 1947, in order to provide it another opportunity, after consultation with its Morocco correspondents, to accept and pay the draft. It is undisputed that the draft was thus returned to the drawee and was not definitely dishonored the second time until November 7, 1947.

The jury might also have found that this amounted to a waiver of protest on October 20th but not on November 7th. The trial judge charged in effect that if this was the case and the plaintiff did not protest the draft until January 20, 1948 the verdict should be for the defendant on the second cause of action. This is asserted by the plaintiff to be error.

If the law of New York were applicable to this situation it might well be that the trial judge's charge was correct. For under Section 267 of the Negotiable Instruments Law of New York, McK.Consol. Laws, c. 38, delay in making protest is excused when caused by circumstances beyond the control of the holder and not imputable to his default, misconduct or negligence, but protest must be made with reasonable diligence when the cause of delay ceases to operate. Certainly an unexplained delay from November 7, 1947 to January 20, 1948 was unreasonable. As we have seen, however, the rights and liabilities of the defendant are here to be determined by the law of the Dominican Republic, not that of New York. We do not find in the record adequate evidence as to the Dominican law on this question. We, therefore, cannot pass upon it but must leave it to be determined by the district court.

■ Finally the plaintiff urges that the trial judge should have granted its request for a special verdict. This was a matter for the trial judge's discretion. Skidmore v. Baltimore & O. R. Co., 2 Cir., 1948, 167 F.2d 54, certiorari denied 335 U.S. 816, 69 S.Ct. 34, 93 L.Ed. 371. We think, however, that this is a striking example of the sort of case in which a special verdict would have been highly desirable. Indeed, it might well have disclosed fact findings by the jury which would have supported the judgment for the defendant on the second cause of action and thus rendered a new trial unnecessary. We commend the special verdict procedure so vigorously championed by Judge Frank in the Skidmore

9. See 2 Daniel, Negotiable Instruments, 7th Ed. § 1061.

10. See Raul Olivera y Borges, Waiver of Protest: A Comparative Study, 1945, 44 Mich.L.Rev. 113, 116.

case to the consideration of the district court for future application in this and other cases of complexity and magnitude.

As we have stated earlier, the verdict as to the second cause of action cannot stand and a new trial must accordingly be granted. Since, however, there was no error as to the first cause of action and the verdict as to it should, therefore, be permitted to stand, there is no reason why the judgment should not be reversed as to the second cause of action only and a new trial granted as to that cause of action alone.[11]

The judgment of the district court will be reversed and a new trial granted as to the second cause of action stated in the complaint. As to the first cause of action stated in the complaint and as to the defendant's counterclaim the judgment of the district court will be affirmed. Each party will bear his own costs in this court.

11. Compare Gasoline Products Co. v. Champlin Refining Co., 1931, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188; Barnes-Manley Wet Wash Laundry Co. v. Automobile Ins. Co., 10 Cir., 1949, 175 F.2d 624.