Jerry B. KLEIN, as trustee for the liquidation of the business of JNT Investors, Inc., Debtor, Plaintiff,

v.

Jay N. TABATCHNICK and S. Wolfe Emmer, Defendants.

No. 74 Civ. 751.

United States District Court, S. D. New York.

Sept. 2, 1976.

Weil, Gotshal & Manges, New York City, for plaintiff; Dennis J. Block, Neal Schwarzfeld, New York City, of counsel.

Hardee, Barovick, Konecky & Braun, New York City, for defendant Emmer; Joseph J. Santora, Robert B. McKay, New York City, of counsel.

Jay N. Tabatchnick, pro se.

ROBERT J. WARD, District Judge.

Plaintiff Jerry B. Klein ("Klein") brings this action pursuant to §§ 10(b) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78aa, §§ 60, 67d and 70e of the Bankruptcy Act, 11 U.S.C. §§ 96, 107 and 110, 28 U.S.C. § 1332, N.Y. Business Corporation Law § 720 (McKinney's 1963), and N.Y. Debtor and Creditor Law §§ 273, 274 and 275 (McKinney's 1945). Klein, as trustee for the liquidation of the business of JNT Investors, Inc. ("JNT"), seeks to avoid the results of two transactions involving the transfer of property by JNT to defendant S. Wolfe Emmer ("Emmer").

The first transaction involves the transfer by JNT of certain of its portfolio securities to Emmer, supposedly as consideration for his having collateralized a personal loan for $50,000 to Jay N. Tabatchnick ("Tabatchnick"), the president of JNT. Plaintiff seeks to have these securities returned to the estate contending that the transfer was fraudulent under § 67d of the Bankruptcy Act.

The second transaction at issue concerns the delivery of a $100,000 check to JNT by Emmer and the return of that check by JNT immediately prior to plaintiff's appointment as trustee. Plaintiff contends this transfer constituted a voidable preference under § 60 of the Bankruptcy Act, and should also be returned to the estate.

Plaintiff and defendants Emmer and Tabatchnick cross-move for summary judgment. For the reasons hereinafter stated, defendants' motions are denied and plaintiff's motion is granted in part and denied in part.

*Background Facts*

JNT had been incorporated in June 1970, by Tabatchnick as a small brokerage firm specializing in underwriting and new issues. At all relevant times, Tabatchnick was the president, a director, and a principal shareholder of JNT. Emmer was also a principal shareholder in the company from its inception. In addition to having served as a director until November 1, 1971, Emmer was also listed as an employee of and consultant to JNT although he was never involved in the daily business activities of the firm.[1] Emmer and Tabatchnick had entered into a written agreement on June 23, 1970, setting forth the terms and conditions of the former's relationship with JNT. Emmer declined to obligate himself to supply subordinated capital to the firm in the future. Essentially, he was assured that his equity position would always be equal to that of Tabatchnick. To this end, various protective provisions were contained in the agreement.

JNT's primary source of income, aside from borrowings and capital contributions from its principals, was derived from underwriting fees. These fees were utilized by

---

1. In fact, Emmer received a bonus in the form of a $7,500 "consulting fee" in May 1971, as did JNT's other officers and directors.

JNT to trade for its own account; trading was heavily concentrated in the securities which it had underwritten. The last successful underwriting by JNT took place in August 1971, after which the firm's financial situation began to deteriorate. Between November 29, 1971 and January 11, 1972, JNT found itself in a position that necessitated the borrowing of $150,000 in three equal installments from First National City Bank ("FNCB"). JNT was required to pledge securities, valued at 200% of the loan, to the bank as collateral. There are uncontroverted allegations that the number of shares JNT pledged as collateral to FNCB exceeded the holdings of such securities in its own account. Apparently, the firm used stock owned by its customers to collateralize its loans and replaced what had been taken with subsequent stock purchases. JNT's worsening financial condition in late 1971 is further evidenced by the firm's need to terminate the services of a number of its employees and reduce the compensation of all other employees and officers.

On February 15, 1972, plaintiff was appointed to liquidate the business of JNT pursuant to the provisions of the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa–111.

### The Transfer of Securities from JNT to Emmer

In October 1970, Tabatchnick arranged a $50,000 personal loan from FNCB. The loan was collateralized by securities furnished by Joseph Taub ("Taub"); the arrangement was that the securities would be returned in one year. Tabatchnick and JNT then entered into an agreement providing that the entire $50,000 was to be used by JNT as capital and subordinating the entire amount to the claims of all present and future creditors of JNT. The agreement also provided that the $50,000 could not be withdrawn until November 1, 1971. Tabatchnick received interest from JNT at the rate of 9% per annum and used that money to pay interest due to FNCB.

On November 1, 1971, Tabatchnick executed an extension of the subordination agreement inasmuch as JNT was still in need of the funds. The extension provided that the $50,000 could not be withdrawn until December 15, 1972. Taub, in November 1971, indicated to Tabatchnick that he desired the return of his securities. However, he made it clear that he would allow his securities to remain as collateral if no replacement collateral could be obtained. Tabatchnick, in order to accommodate Taub, approached Emmer to secure replacement collateral. On December 11, 1971, after Tabatchnick had already extended his subordinated loan to JNT, Emmer authorized the delivery of securities owned by him to replace the Taub collateral. In exchange for this personal benefit, Tabatchnick caused certain of JNT's securities to be delivered to Emmer on December 13. The agreement between Tabatchnick and Emmer was that the latter would receive 10,000 shares of common stock of Educational Video Corporation and warrants to purchase 5,000 shares of common stock of Commonwealth Silver Industries, Ltd., Vicon Products Corporation, and Charter Funding Corporation.

█ The issues to be resolved in determining whether the delivery of these securities constituted a fraudulent transfer are set out in § 67d(2)(a) of the Bankruptcy Act. For a transfer to be declared fraudulent under this section, four preconditions must be satisfied:

1. The transfer must be made within one year of the initiation of the liquidation proceedings;

2. Creditors of the debtor must exist at the time of the transfer;

3. There must be an absence of fair consideration for the transfer; and

4. The debtor must either be insolvent at the time of the transfer or thereby rendered insolvent. Summary judgment is proper,

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

If there is shown to be any genuine issue of material fact, then summary judgment must be denied.

The petition initiating the liquidation proceedings was filed on February 15, 1972, clearly within one year of the date of the transfer. In addition, there is no dispute that creditors of JNT existed at the time the transfer was made.

However, the parties are in dispute over whether the transfer of JNT's securities to Emmer was for fair consideration. They also disagree as to JNT's solvency at the time of the transfer.

### The Securities Transferred

As a threshold question, defendants contend that there was actually no "transfer" of property from JNT to Emmer. They assert that JNT retained title to the securities, no stock powers were furnished to Emmer, and most of the purchase warrants were not exercisable at the time of the transfer. Defendants further argue that the securities were valueless both to Emmer and to JNT.

█ Since there is no dispute that the physical possession of the securities passed from JNT to Emmer, a transfer must be found as a matter of law. Section 1(30) of the Bankruptcy Act defines "transfer" as including

"the sale and every other different mode, direct or indirect, of disposing of or of parting with property or with an interest therein or with the possession thereof. . . ."

The definition of a "transfer" in the bankruptcy sense has consistently been given a most comprehensive construction. *Pirie v. Chicago Title and Trust Co.*, 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171 (1901). Clearly, JNT had given something up. It was unable to sell or otherwise dispose of securities it no longer physically possessed.

### Fair Consideration

█ Whether the transfer of corporate assets by a corporation's president in exchange for the collateralizing of the president's personal loan, the proceeds of which were previously lent to the corporation and were subordinated to the claims of all of its creditors, was for fair consideration involves an issue of law and is thus appropriate for summary judgment.

█ Emmer provided substitute collateral for Tabatchnick's personal loan, the proceeds of which were already legally committed to the corporation. JNT's transfer of its securities to Emmer provided a direct benefit to Tabatchnick rather than to JNT. Transfers made to benefit third parties are clearly not made for the fair consideration required by § 67d(2)(a). *See, e. g., In re O'Bannon*, 484 F.2d 864 (10th Cir. 1973); *Bullard v. Aluminum Co. of America*, 468 F.2d 11 (7th Cir. 1972); *United Towing Co. v. Phillips*, 242 F.2d 627 (5th Cir.), *cert. denied*, 355 U.S. 861, 78 S.Ct. 93, 2 L.Ed.2d 68 (1957); 4 *Collier on Bankruptcy* ¶ 67.33 at 514.1 (14th ed. 1975).

It is indeed dubious whether JNT received any benefit whatsoever. Tabatchnick approached Emmer for substitute collateral around the time the subordination agreement was extended; Emmer verbally agreed to provide certain securities as collateral. However, written authorization for the delivery of these securities to FNCB was dated December 11, 1971, after Tabatchnick had already executed the extension of the subordination agreement on November 1, 1971. Tabatchnick could not have withdrawn his loan to JNT under the terms of the subordination agreement even if he wanted to. Moreover, he had been assured that the Taub collateral would not be removed if still required by him. Thus, JNT was secure in its retention of the loan proceeds.

Defendants are mistaken in their contention that consideration is found in JNT's use of the proceeds of the loan Emmer was collateralizing. Such an argument is premised upon an identity of interest between Tabatchnick and JNT. However, an examination of the record reveals that such a relationship is clearly lacking. There is no evidence of any commingling of Ta-

batchnick's and JNT's assets or business affairs, or of the existence of common debts. *See In re O'Bannon, supra; Bullard v. Aluminum Co. of America, supra; In re B–F Building Corp.,* 312 F.2d 691 (6th Cir. 1963); *McNellis v. Raymond,* 287 F.Supp. 232 (N.D.N.Y.1968), *modified,* 420 F.2d 51 (2d Cir. 1970). Nor is there any indication that JNT had some obligation to fulfill with respect to the arrangement between Tabatchnick and Emmer.[2] *Barr and Creelman Mill and Plumbing Supply Co. v. Zoller,* 109 F.2d 924 (2d Cir. 1940).

For the foregoing reasons, the Court finds that the transfer of JNT's securities was not for fair consideration as required by § 67d(2)(a).

*Insolvency*

■ Insolvency is defined in § 67d(1)(d) as occurring when the present fair salable value of the debtor's property is less than the amount required to pay its debts. Plaintiff presents tables of financial data, based on JNT's own books and records, to demonstrate that JNT was insolvent at the time of the transfer. These figures detail the firm's financial condition as of November 30 and December 31, 1971 and February 8, 1972; insolvency is indicated on each of the dates. The trustee also states that examination of JNT's records revealed no transactions on the books between November 30 and December 13, the date of the transfer. The inference is that JNT remained insolvent during that entire period, and therefore was insolvent at the time of the transfer.

Defendants do not controvert the presumption of insolvency raised by plaintiff. Instead, the Court is presented with nothing more than a bare denial of the allegations of insolvency as of December 13. Rule 56(e), Fed.R.Civ.P., provides, in part, as follows:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

The points that defendants raise regarding insolvency are all satisfactorily explained by plaintiff. Although they had complete access to JNT's books and financial records and availed themselves of the opportunity to depose plaintiff, defendants set forth no facts to suggest that JNT was not insolvent on December 13. Thus, defendants may not complain of non-access to material facts. *Perma Research and Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969); *see* Rule 56(f), Fed.R.Civ.P. There is no indication that defendants sought out a certified public accountant to examine JNT's books and verify the accuracy of plaintiff's use of the financial data. At the very least, defendants' failure to submit any credible evidence demonstrating JNT's solvency as of the date of the transfer strongly suggests that they were unable to discover any support for their bare denial.

■ Absent a showing of specific facts regarding JNT's financial condition on December 13, defendants' claim of solvency must be regarded as speculative. The Court finds that defendants' assertions do not raise factual questions concerning the accuracy of the financial data upon which plaintiff's allegations of insolvency are based and, therefore, are not sufficient to defeat a motion for summary judgment. *See Perma Research and Development Co. v. Singer Co., supra; Teledyne Industries, Inc. v. Eon Corp.,* 373 F.Supp. 191 (S.D.N.Y. 1974).

Since the cross-motions for summary judgment are resolved in favor of plaintiff on the finding that the transfer of securities from JNT to Emmer was fraudulent

---

2. As noted above, JNT paid Tabatchnick interest at an annual rate of 9% on the subordinated loan.

under § 67d(2)(a), it is unnecessary to discuss plaintiff's other claims for relief regarding this transaction.

### Damages

The issue of liability having been decided in favor of plaintiff, the Court now turns to the question of damages.

Plaintiff seeks damages in the amount of $167,100, the alleged value of the common stock and common stock purchase warrants transferred by JNT to Emmer on December 13, 1971. This value is based upon the market value of the common stock and the difference between the exercise price and market price of the warrants as of the date of the transfer. On the other hand, defendants contend that the securities are virtually worthless and challenge the correctness of plaintiff's method of valuation.

The contention that the securities are worthless is patently absurd. Defendants' argument grows out of their claim that Emmer never actually received anything; however, it has already been found that a transfer did take place. The fact that Emmer had neither ownership of the securities nor stock powers in order to transfer them does not render them valueless to JNT.

In calculating the value of the securities, defendants allege that plaintiff failed to take into account that all but the Commonwealth Silver warrants were not exercisable until several months after the date of the transfer. An additional claim is raised that the warrants were not registered and were considered non-liquid, and consequently given no value, by the National Association of Securities Dealers, Inc. ("NASD"), Securities Exchange Commission ("SEC") and FNCB.

■ The fact that most of the warrants were not exercisable at the time of the transfer is sufficient to raise a genuine issue for trial as to the value of the warrants.[3] The market price of the Vicon Products and Charter Funding warrants

may have fluctuated dramatically prior to their exercise dates. Such potential changes in the values of these warrants might well affect their value to JNT at the time of the transfer.

■ Furthermore, the parties do not adequately address themselves to the question of the registration of the securities. If some or all of the securities were unregistered, then transferability would be severely hampered which, in turn, could affect the market value of the securities.

Accordingly, summary judgment is denied as to the amount of damages.

### The $100,000 Check

JNT's financial condition had deteriorated considerably by February 1972. To comply with the net capital requirements of the SEC and stave off an investigation of its financial affairs by the NASD, JNT sought additional capital. This capital was needed immediately to prevent the NASD from initiating liquidation proceedings.

Tabatchnick approached Emmer with the intent of securing a short-term $100,000 loan. Emmer claims that he directed his stockbroker, Andresen and Co. ("Andresen") to furnish a check in that amount drawn to Tabatchnick. However, a check in the amount of $100,000, dated February 10, 1972, was made out to JNT. Emmer claims that he subsequently received a confirmation letter from Andresen dated February 11, 1972. In the meantime, Tabatchnick advised the NASD that he was in possession of a $100,000 check from Emmer that could be contributed to JNT. Emmer, upon receipt of the confirmation letter, notified Andresen by telephone and by letter dated February 14, 1972 that he wanted payment of the check stopped. While this was going on, Tabatchnick decided that he would not turn over the check to JNT. Instead, on February 15, he tore the signature off the check to destroy its negotiability and returned it to Andresen.

---

**3.** Rule 56(c), Fed.R.Civ.P., provides that: "A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

There is no dispute that a $100,000 check was drawn to JNT by Andresen, never presented for payment and in fact voided by Tabatchnick, countermanded by Emmer, and physically returned to Andresen. The question is whether these circumstances compel the finding on summary judgment, that a voidable preference under § 60 of the Bankruptcy Act was created.

 The law that governs the construction and operative effect of a check is the law of the state where the check was drawn, in this case New York. *United States v. Guaranty Trust Co.*, 293 U.S. 340, 55 S.Ct. 221, 79 L.Ed. 415 (1934); *Bank of Nova Scotia v. San Miguel*, 214 F.2d 102 (1st Cir. 1954); *Swift and Co. v. Bankers Trust Co.*, 280 N.Y. 135, 19 N.E.2d 992 (1939).

Under New York law,

"The drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder or to any indorser who takes it up." N.Y.U.C.C. § 3–413(2) (McKinney's 1964).

Where payment on a check has been countermanded by the drawer, U.C.C. § 3–511(2)(b) states that the drawer is not entitled to presentment, notice or protest. Although the drawee bank cannot now make payment from the drawer's funds because of the stop order, the holder of the check has a cause of action on the underlying obligation or on the instrument itself, despite the fact that the instrument was never presented for payment. *See Bank of Nova Scotia v. San Miguel*, 196 F.2d 950 (1st Cir. 1952); *Gonzalez v. Industrial Bank of Cuba*, 12 N.Y.2d 33, 234 N.Y.S.2d 210, 186 N.E.2d 410 (1962); *Swift and Co. v. Bankers Trust Co., supra*; B. Clark and A.

Squillante, *The Law of Bank Deposits, Collections and Credit Cards* 16–24 (1970).

Although Emmer directed Andresen to draw a check for $100,000, the record is barren as to the signature appearing on the instrument as a result of Tabatchnick's act of tearing off the signature. There is no showing that the check was signed by an authorized representative or that the instrument named Emmer or indicated that Andresen was acting on behalf of him. These questions are determinative of liability on the instrument,[4] and go to answering who the drawer of the check was.

JNT, as the holder of the check, is not a holder in due course since it did not take the instrument for value. N.Y.U.C.C. §§ 3–302 and 3–303 (McKinney's 1964). As one who did not have the rights of a holder in due course, JNT took the check subject to "all defenses of any party which would be available in an action on a simple contract." N.Y.U.C.C. § 3–306(b).

 Emmer claims that he agreed to lend Tabatchnick $100,000 for his personal use and that Andresen incorrectly made out the check to JNT; the defense of mistake is thereby raised. In dispute is the mutual intent of the parties regarding whom the loan was for. The circumstances leave it unclear whether Tabatchnick was acting in his individual capacity or in his representative capacity as president of JNT. Where the purpose of a contract is ambiguous— here, the parties to the contract, and thus the contract itself, are in doubt—it is essential to determine the mutual intent of the parties as it existed at the time the contract was formed and in the light of the surrounding circumstances. *Humphreys v. Amerada Hess Corp.*, 487 F.2d 800 (10th Cir. 1973); *Mailer v. RKO Teleradio Pictures, Inc.*, 332 F.2d 747 (2d Cir. 1964); *Memphis*

---

4. N.Y.U.C.C. § 3–403(2) states:

(2) An authorized representative who signs his own name to an instrument

(a) is personally obligated if the instrument neither names the person represented nor shows that the representative signed in a representative capacity;

(b) except as otherwise established between the immediate parties, is personally obli-

gated if the instrument names the person represented but does not show that the representative signed in a representative capacity, or if the instrument does not name the person represented but does show that the representative signed in a representative capacity.

v. Ford Motor Co., 304 F.2d 845 (6th Cir. 1962); West, Weir and Bartel, Inc. v. Mary Carter Paint Co., 25 N.Y.2d 535, 307 N.Y.S.2d 449, 255 N.E.2d 709 (1969), remittitur amended, 26 N.Y.2d 969, 311 N.Y.S.2d 13, 259 N.E.2d 483 (1970).

"Sometimes one party is mistaken as to the identity of the other, clearly a case in which the other party would not be laboring under the same mistake; but if that other party knows or has reason to know of the mistake, seldom if ever can he hold the first party to the agreement." 3 Corbin on Contracts § 608 at 671 (1960). Thus, if a material unilateral mistake is known to the other party or the other party should have known of it, the contract becomes voidable. Potucek v. Cordeleria Lourdes, 310 F.2d 527 (10th Cir. 1962), cert. denied, 372 U.S. 930, 83 S.Ct. 875, 9 L.Ed.2d 734 (1963); United States v. Jones, 176 F.2d 278 (9th Cir. 1949); C. N. Monroe Manufacturing Co. v. United States, 143 F.Supp. 449 (E.D.Mich.1956); see Grymes v. Sanders, 93 U.S. [3 Otto] 55, 23 L.Ed. 798 (1876). "The rule is well settled that an offer containing an obvious mistake is not susceptible of acceptance." Mutual Life Insurance Co. v. Simon, 151 F.Supp. 408, 413 (S.D.N.Y.1957). A mistake as to the identity of one of the parties is an obvious mistake and goes to the heart of the transaction. Potucek v. Cordeleria Lourdes, supra. A clerical error that frustrates the understanding of the parties, where the party committing the error acts promptly to remedy the mistake upon learning of it and thereby avoids ratification of the contract, affords grounds for relief from the effects of the contract. See Pioneer Mut. Compensation Co. v. Vernon Casualty Insurance Co., 130 Colo. 140, 273 P.2d 888 (1954). Emmer appears to have ordered payment of the check stopped promptly upon learning who the payee was, although he did not provide an explanation for doing so.

Thus, if Emmer intended the $100,000 check to be made out to Tabatchnick and the latter either knew or had reason to know that he, rather than JNT, was the intended payee, then JNT would not be entitled to the check. Consequently, plaintiff, as trustee for JNT, would have no right to reclaim the $100,000 for the benefit of the estate. Clearly, questions of intent are not appropriate for resolution on summary judgment. Accordingly, summary judgment is denied on the cause of action arising from JNT's return of the $100,000 check to Emmer.

*Conclusion*

Defendants' motions for summary judgment are denied. Plaintiff's cross-motion for summary judgment is granted in part and denied in part, consistent with this opinion. A trial is necessary to determine the amount of damages resulting from JNT's fraudulent transfer of its securities to Emmer and whether the return of the $100,000 check to Emmer constituted a voidable preference.

Settle order on notice.