In re SUBURBAN MOTOR FREIGHT, INC., Debtor.

Stephen K. YODER, Trustee, Plaintiff,

v.

T.E.L. LEASING, INC., et al., Defendants.

Bankruptcy No. 2–87–00822. Adv. No. 2–87–0276.

United States Bankruptcy Court, S.D. Ohio, E.D.

Dec. 20, 1990.

Amended Judgment Entry Jan. 17, 1991.

985

Quintin F. Lindsmith, Bricker & Eckler, Columbus, Ohio, for Stephen K. Yoder, plaintiff/trustee.

Thomas C. Pavlik, William J. Novak, Sindell, Rubenstein, Einbund, Pavlik, Novak & Celebrezze, Cleveland, Ohio, for Shareholder defendants.

Michael J. Fusco, Fusco & Ison, Westerville, Ohio, for T.E.L. Leasing, Inc. and Transp. Equipment Services, Inc.

Edward F. Chuha, Kincaid, Palmer & Randall, Joseph A. Butauski, John C. Nemeth & Associates, Columbus, Ohio, for Samuel B. Randall.

John E. Hoffman, Jr., Arter & Hadden, Columbus, Ohio, for S. Robert Davis.

Thomas A. Kuhn, Columbus, Ohio, pro se.

Charles M. Caldwell, Columbus, Ohio, Asst. U.S. Trustee.

Polly J. Harris, Porter, Wright, Morris & Arthur, Columbus, Ohio, for The Huntington Nat. Bank.

Jennifer T. Mills, Porter, Wright, Morris & Arthur, Columbus, Ohio, for The Huntington Nat. Bank, Escrow Agent.

Reginald W. Jackson, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Banc-Ohio Nat. Bank.

Robert J. Sidman, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Buckeye Nominee Co.

Edward F. Chuha, Kincaid, Palmer & Randall, Joseph A. Butauski, John C. Nemeth & Associates, Columbus, Ohio, for Samuel B. Randall.

John E. Hoffman, Jr., Arter & Hadden, Columbus, Ohio, for S. Robert Davis.

Thomas A. Kuhn, Columbus, Ohio, pro se.

## OPINION AND ORDER

R. GUY COLE, Jr., Bankruptcy Judge.

### I. INTRODUCTION

This adversary proceeding was commenced on September 28, 1987, by Stephen K. Yoder, the duly-appointed trustee in this Chapter 7 case, against twenty-four defendants, nineteen of whom owned or held shares in Suburban Motor Freight, Inc. and Suburban Distribution Systems, Inc.[1] On August 31, 1990, the trustee filed a motion for summary judgment on Count I of his Third Amended Complaint, seeking avoidance of the transfer described therein pursuant to 11 U.S.C. § 548(a)(2). The former shareholders of Suburban Motor Freight, Inc. and Suburban Distribution Systems, Inc. who remain as defendants have opposed the motion and have filed a cross-motion for summary judgment, which the trustee has opposed. An oral hearing on the motions was held on November 1, 1990, after which the Court took the matter under advisement.

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this judicial district. This is a core proceeding which the Court is empowered to hear and determine under 28 U.S.C. § 157(b)(1) and (2)(F), (H) and (O).

### II. FACTUAL BACKGROUND

#### A. Background Information

1. James R. Riley and his brother started a milk delivery business in 1912. By 1916 the business had evolved into a trucking company which operated under the name of Suburban Motor Freight, Inc. ("Suburban"). Riley was Suburban's sole shareholder and president, maintaining these positions until his death in 1981. Upon his death, Riley apparently bequeathed his Suburban shares to a group of individuals, including, but not limited to, various family members.

2. In 1980, Congress enacted the Motor Carrier Act, which, inter alia, deregulated the trucking industry. The market conditions resulting from passage of the Motor Carrier Act forced commercial shippers to discount shipping rates which previously had been set by tariff. The institution of such discounting practices by Suburban was a major factor in the company's inability to operate profitably.

3. Suburban's collective bargaining agreement with its employees worked a further hardship on the company's financial health. By 1982 the shareholders realized that Suburban's bargaining agreement and the existing market conditions rendered it unable to operate at a profit. When this determination was made, Suburban's shareholders authorized the incorporation of Suburban Distribution Systems, Inc. ("SDS") as a holding company for Suburban. At the same time, the shareholders also authorized the incorporation of Advanced Distribution Systems, Inc. ("ADS"), which is a wholly-owned subsidiary of SDS. ADS commenced operations in 1983 as a non-unionized trucking company. Upon SDS' incorporation, Suburban's shareholders became the shareholders of SDS (the "Shareholders"). SDS, as Suburban's parent corporation, became its sole shareholder. The Shareholders anticipated that Suburban, with its unionized workforce, would eventually cease operations and that ADS would flourish.

4. In 1983, Riley's son-in-law, Thomas Losh, was chosen to be Suburban's board chairman and a director; Lawrence LeGrand became Suburban's president.

5. Suburban operated at a loss from 1982 until it filed its bankruptcy petition on February 27, 1987. The financial statements for the year ending December 31, 1983, reflect a net income of $197,636; however, this figure is misleading because

---

1. The following former shareholders have been dismissed as defendants: BancOhio National Bank, trustee for the estate of Leo Kletzly; BancOhio National Bank, trustee for the estate of Donald Dawson; Marcelle S. Kletzly; S. Robert Davis; and Thomas A. Kuhn. Other non-shareholder defendants who have been dismissed as defendants are Samuel B. Randall and Buckeye Nominee Company. TEL Leasing, Inc., Transportation Equipment Services, Inc., and the Huntington National Bank have not opposed the trustee's motion.

$500,000 listed as revenue on such statements was generated from an employee wage-concession program, not from operations.

6. By 1984 Suburban had a negative net worth and had borrowed to its capacity. The financial statements for the year ending December 31, 1984, reflect a loss of $175,840. The loss reflected on Suburban's financial statements again was somewhat misleading inasmuch as the loss was offset by the receipt of approximately $500,000 in revenue from the sale of a shipping terminal in Chicago, Illinois. Actual losses from operations far exceeded $175,840. In the first three months of 1985 Suburban incurred operating losses approximating $400,000.

B. The Shares' Purchase Contract

7. On April 17, 1985, the directors of SDS concluded that, in view of its dire financial straits, Suburban could remain open for business for no more than six months. On June 25, 1985, at a joint meeting of the shareholders and directors of SDS and Suburban, the shareholders unanimously authorized LeGrand to secure a buyer for SDS. The meeting's minutes further reflect the unanimous passage of a motion declaring an asset distribution dividend from Suburban to SDS.

8. Having been authorized by the Shareholders to locate a purchaser for SDS, LeGrand placed an advertisement in selected newspapers soliciting prospective buyers. There were approximately thirty inquiries; however, only two concrete offers materialized. One offer, from an entity known as Maxitron, was rejected because it provided for the assumption of Suburban's liabilities but only a nominal cash payment to the Shareholders. The other offer, submitted by Transportation Equipment Services, Inc. ("TES") through its president, L. Edward Mulcahy, proposed to purchase SDS' corporate shares (the "Shares") for $3,000,000 in cash. The Shareholders agreed to accept TES' offer.

9. On October 9, 1985, the Shareholders adopted a resolution authorizing the execution of the Shares' Purchase Contract (the "Contract"), pursuant to which they would sell the Shares to TES for $3,000,000 in cash. The Contract was signed by the Shareholders and TES on October 14, 1985. The Contract was to be consummated at a closing (the "Closing" or "Closing Date") to occur within forty-five days of the execution date of the Contract.

10. In December, 1985, after several extensions of the Closing Date had passed, the Shareholders filed a lawsuit against TES for its failure to perform under the Contract. In January of 1986, the lawsuit was settled pursuant to an agreement between the Shareholders and TES. The agreement permitted a further extension of the Closing Date upon the payment to the Shareholders of the sum of (i) $100,000, representing the earnest money deposited at the Huntington National Bank ("HNB") by TES at the time the Contract was signed by the parties, and (ii) $150,000 from TES as a prepayment of the purchase price under the Contract. The Shareholders, in turn, lent the entire $250,000 to Suburban for use as desperately needed operating capital.[2] The release of the $100,000 earnest-money deposit was effected by Mulcahy's instructions to HNB, the escrow agent designated under the terms of the Contract and the depository in which these funds were maintained.

11. In December, 1985, Suburban commenced preparations for the implementation of an employee stock ownership plan ("ESOP"). In furtherance of the implementation of the ESOP, the Shareholders and SDS' directors, acting without a meeting on December 30, 1985, declared an upstream dividend to SDS consisting of all the real property of Suburban and further directed that the earned surplus account of Suburban be charged for the dividend in the amount of $1,432,751. (It is unclear whether this dividend is the "asset distribu-

---

**2.** The sum of $250,000 was returned to TES on March 24, 1986, in the form of two checks each payable in the amounts of $125,000 from Suburban and ADS, respectively. The record does not specify the reason for ADS' issuance of a check to TES.

tion dividend" referred to in paragraph 7 of this Opinion.)

## C. Events Preceding the Closing

12. TES' principal business in 1986 was the purchase and sale of used trucks and trailers, not the ownership or operation of trucking companies. On some date prior to the Closing, TES determined that it was interested in purchasing Suburban's used trucks and trailers (the "Rolling Stock"), not the Shares in SDS.

13. The Closing was scheduled for March 21, 1986. On March 20, 1986, the day before the Closing, TES assigned its right to purchase the Shares for $750,000 (the "Assignment") to Continental Trucking Services, Inc. ("CTS"), a company formed that day. TES and CTS thereafter advised the Shareholders of the Assignment. CTS offered to purchase the Shares pursuant to the Contract and Assignment by paying the Shareholders $2.1 million in cash and delivering a promissory note ("Note") of $900,000 to them, instead of the $3,000,000 cash purchase price set forth in the Contract. CTS proposed to deposit the Note in the escrow account ("Escrow Account") established under the Contract. CTS further proposed to secure the Note with mortgages on all the real property owned by SDS prior to its merger into CTS.[3] The Shareholders apparently agreed to the terms of CTS' offer at the Closing.

14. CTS also agreed to sell the Rolling Stock to a company known as TEL Leasing, Inc. ("TEL") for the sum of $2.5 million.[4] TEL is owned and operated in common with TES.

15. Mulcahy, acting as TEL's agent, sought financing from the Bank of New England (the "Bank") for the purchase of the Rolling Stock. The Bank's agreement to lend TEL $2.5 million for the purchase of the Rolling Stock was conditioned upon TEL's pledge of the Rolling Stock as security for TEL's obligations under the loan agreement. The purpose of the loan, which was executed by TEL and guaranteed by TES and Mulcahy, was to finance the purchase of the Rolling Stock.

16. CTS also entered into a master lease agreement with TEL, agreeing to a leaseback of a portion of the Rolling Stock from TEL. The master lease provided that CTS would make monthly lease payments to TEL[5] for a term of thirty-six (36) months. The payments under the master lease equaled the monthly payments owed by TEL to the Bank pursuant to its loan agreement with the Bank.

17. Either Mulcahy or Herbert Poston, a director of TES and CTS, asked LeGrand (Suburban's president) to sign the certificates of title to the Rolling Stock for purposes of their transfer. It is unclear whether the titles were endorsed in blank, to TEL, or both. LeGrand complied with the request and signed the titles to the Rolling Stock on March 20, 1986.[6]

## D. The Closing[7]

18. The Closing of the Contract occurred on March 21, 1986, at the offices of HNB.

19. The Bank, upon instructions from its representative, Robert H. Quinn, wired

---

3. Upon the purchase of the Shares by CTS, and pursuant to the terms of a resolution of its directors, CTS and SDS would merge into a single entity, with CTS as the surviving entity.

4. CTS apparently believed it possessed the authority to sell the Rolling Stock—owned by Suburban—upon the merger of SDS into CTS. This belief presumably was based upon CTS' becoming the sole shareholder of Suburban following the consummation of the merger.

5. The master lease, entitled "Notice and Acceptance of Assignment," provides that all remittances due TEL thereunder were assigned to the Bank. Further, Gerald W. McIntyre, Subur-

ban's president from March 21, 1986 until the filing of its bankruptcy petition, asserts that Suburban, not CTS, actually made the monthly payments to the Bank. McIntyre Depo. at 34.

6. The parties have agreed that there is no evidence which definitively establishes whether LeGrand transferred ownership of the Rolling Stock to TEL by endorsing the certificates of title and naming TEL as the purchaser, or by simply leaving blank the name of the purchaser.

7. The parties agree that the precise chronological order of the events occurring at the Closing is undeterminable.

the sum of $2.5 million to HNB. Following its receipt, the $2.5 million was deposited in the Escrow Account pending further directives from the Bank.

20. After Quinn confirmed that the titles to the Rolling Stock had been endorsed by LeGrand—and presumably had been or would be delivered to TEL—he authorized HNB to issue two checks from the $2.5 million on deposit in the Escrow Account. Pursuant to Quinn's directives, one check totaling $18,000 was issued by HNB and delivered to the Bank in payment of costs incurred in connection with the Closing; the other check was issued by HNB and made payable to SDS in the amount of $2.482 million. The $2.482 million check was delivered to SDS by HNB and endorsed over to Suburban for deposit in its regular HNB checking account.

21. Suburban, at LeGrand's behest, immediately transferred to the Escrow Account $2.1 million of the $2.482 million deposited in Suburban's account. Suburban made this transfer by drawing two separate checks on its checking account. Both checks were made payable to "Huntington National Bank, Escrow Agent"; one check was in the amount of $250,000 and the other was in the amount of $1.85 million. At the time these checks were deposited in the Escrow Account, they were the only funds on deposit in that account. Thereafter, presumably in accordance with the terms of an agreement reached among the Shareholders, HNB disbursed another $250,000 to LeGrand as a fee for securing a purchaser of the Shares, and $37,390.25 and $18,500 to Samuel Randall and Losh, respectively, for legal services rendered to SDS in connection with the sale of the Shares. The balance of the $2.1 million was paid to the Shareholders in accordance with their ownership interests in SDS, leaving a balance of $10,110 in the Escrow Account.

E. Post–Closing Events

22. Following consummation of the Closing, and pursuant to a resolution passed by CTS' directors, CTS and SDS merged into a single corporate entity; CTS became the surviving entity and SDS ceased to exist.

23. After the Closing was consummated, Suburban owned no Rolling Stock and had only $382,000 in its regular checking account. From this amount, Suburban paid $125,000 to TES on March 24, 1986, apparently as a partial repayment of the $250,-000 settlement paid to the Shareholders and lent to Suburban. After this transfer, approximately $257,000 remained in Suburban's account at a time when its expenses continued to exceed its income. This amount was less than half the company's monthly payroll expense. During the month of March, 1986, Suburban incurred operating losses of $417,881.

24. Following consummation of the Closing, McIntyre succeeded LeGrand as Suburban's president. McIntyre possessed extensive experience in the trucking industry.[8]

25. In less than two months after the Closing, Suburban became overdrawn on its checking account and was unable to pay its debts as they came due. Suburban sustained a year-end loss of $3,554,994 in 1986.

26. On February 27, 1987, Suburban filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Chapter 11 case was converted to a case under Chapter 7 on May 23, 1988. Stephen K. Yoder was appointed interim trustee by virtue of 11 U.S.C. § 702(d), and became trustee in the case at the conclusion of the meeting of creditors held pursuant to §§ 341 and 343 of the Bankruptcy Code.

## III. SUMMARY JUDGMENT

In 1986, the Supreme Court gave new life to summary judgment practice. *See*

---

**8.** Commencing his career in the trucking industry in 1960, McIntyre has been employed by several trucking lines, including Shriver Truck Lines, Motor Freight Express, Commercial Lovelace, Navajo Freightlines, and P.I.E. Nationwide. His positions with these various companies ranged from terminal manager to chief executive officer to, most recently, vice-president of operations for P.I.E. Nationwide. He also has participated in several seminars focusing on the trucking industry.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Scholars and courts are in agreement that a 'new era' in summary judgments dawned by virtue of the Court's opinions in these cases." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989); *Gilbert v. New England Mutual Life Ins. Co. (In re Worl)*, 111 B.R. 665 (Bankr.S.D.Ohio 1990).

> On the whole, these decisions reflect a salutary return to the original purpose of summary judgment. Over the years, decisions requiring denial of summary judgment if there was even a suggestion of an issue of fact had tended to emasculate summary judgment as an effective procedural device.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 at 1476. The Supreme Court's rulings evidence its desire to remove artificial barriers, *i.e.*, the hint of a genuine issue of material fact, from a court's ability and willingness to grant summary judgment in appropriate cases.

■ Bankruptcy Rule 7056(c) mirrors Federal Rule of Civil Procedure 56(c) and sets forth general standards for the issuance of summary judgment. It provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.Rule of C.Pro. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. at 2511 (emphasis in original); *Kendall v. The Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). Insub-

stantial issues of fact will not, therefore, preclude summary judgment, and the resources of litigants and the courts shall not be wasted with actual trials which could, and should, have been disposed of summarily. *See Street v. J.C. Bradford & Co.*, 886 F.2d at 1480 (citing Childress, *A New Era for Summary Judgment: Recent Shifts at the Supreme Court*, 116 F.R.D. 183 (1987)).

■ The party seeking summary judgment bears the initial burden of establishing, in light of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, the absence of a genuine issue of material fact. The ultimate burden of demonstrating the existence of a genuine issue of material fact, however, lies with the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Fed.Rule Civ.Proc. 56(e) (emphasis added) ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56; *See First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

The Sixth Circuit Court of Appeals, in *Street v. J.C. Bradford & Co.*, recently reviewed the impact of *Anderson, Celotex,* and *Matsushita* on summary judgment practice. The court concluded that these three decisions establish, at a minimum, the following new-era principles:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Case involving state-of-mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed-verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed-verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.* the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Street v. J.C. Bradford & Co.*, 886 F.2d at 1479–1480 (footnote omitted).

Employing the aforementioned principles as guidelines, the Court's legal conclusions follow.

## IV. DECISION

### A. Preliminary Matters

The trustee and the Shareholders have filed motions for summary judgment. The trustee's motion seeks summary judgment on Count I of his six-count Third Amended Complaint. Count I of the Third Amended Complaint requests avoidance of the $2.1 million transferred by Suburban to the Shareholders, LeGrand, Losh, and Randall; and the $125,000 transferred by Suburban to TES on March 24, 1986. Count I also seeks the return of $38,312.50, which represents interest payments under the Note,[9] from HNB. The Shareholders also seek summary judgment, alleging that they are entitled to judgment as a matter of law against the trustee on Counts I, II, III, IV and VI of the Third Amended Complaint.[10]

---

9. Suburban transferred the sums of $19,900 and $18,412.50 (totaling $38,312.50) on June 20, 1986, and September 23, 1986, respectively, to HNB, as escrow agent, for deposit in the Escrow Account. Apparently this money eventually was to be disbursed to the Shareholders as interest payments under the Note. No evidence was introduced by the parties as to why Suburban, and not CTS, paid the interest due and owing under the terms of the Note.

10. None of the parties has sought summary judgment on Count V of the Third Amended Complaint. The trustee alleges in Count V that LeGrand, TES, and TEL engaged in a course of inequitable conduct which resulted in injury to

The parties concede that there are no material facts in dispute; rather, the dispute centers around the parties' respective interpretations of the facts.

Resolution of both motions for summary judgment is difficult given the widely-divergent interpretations of asserted facts and the admitted lack of clarity concerning many details of the Closing. It is the Court's determination that the material facts at issue here are undisputed; the trustee and Shareholders simply have reached markedly disparate legal conclusions concerning these facts.

At first blush it may appear that even the varying interpretations of facts preclude the granting of summary judgment on either motion. However, when the facts of record are measured against the so-called new era principles of summary judgment practice, it is clear that all the facts necessary for a decision on Count I of the Third Amended Complaint are before the Court and are undisputed. Indeed, the parties acknowledge that all known facts relative to the Contract and the Closing have been ascertained through exhaustive discovery. The parties further concede that a trial on this matter simply would involve repetition of deposition testimony and would shed no further light on elements of the transaction which are unexplained and likely are not susceptible to explanation.

**B. Count I of the Third Amended Complaint**

The trustee asserts entitlement to judgment as a matter of law on his claim under 11 U.S.C. § 548(a)(2)(A)–(B)(ii) and (iii) of the Bankruptcy Code. Section 548(a)(2) provides, in pertinent part, as follows:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(2)(A) received less than a reasonable equivalent value in exchange for such transfer or obligation;  and

. . . .

(B)(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;  or

(iii) intended to incur, or believe that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Section 548(a)(2) is directed at transfers from which fraud will be presumed in law, despite a lack of actual intent to defraud. 4 *Collier on Bankruptcy*, Para. 548.02, at 548–29 (L. King 15th ed. 1989).

Section 548(a)(2)(A)–(B)(ii) specifically concerns transfers and obligations for less than a reasonably equivalent value which leave the debtor with unreasonably small capital for the continuance of a business or transaction. Whether the amount of capital remaining in the hands of the debtor is unreasonably small is a question of fact. *Barrett v. Continental Illinois Nat'l Bank & Trust Co.*, 882 F.2d 1 (1st Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990) (Uniform Fraudulent Conveyance Act case); *Credit Managers Assoc. v. Federal Co.*, 629 F.Supp. 175, 183 (C.D.Cal.1985); 4 *Collier on Bankruptcy*, Para. 548.04, at 548–56 (L. King 15th ed. 1989).

Further, in a proceeding under § 548(a)(2)(A) and (B)(iii), the trustee must show more than a chronological relationship between the act of the debtor and the subsequently incurred debt. Proof must be adduced sufficient to justify the conclusion that the debtor's transfer or obligation was contemporaneous with an intent or belief that his subsequent creditors would be injured, *i.e.*, that the debtor would be unable to pay such debts as they matured.

In an action by a trustee to set aside a conveyance under § 548, the burden of

Suburban's creditors. On this basis, the trustee seeks equitable subordination of the allowed claims of these defendants pursuant to 11 U.S.C. § 510(c).

proof that the conveyance was fraudulent and, hence, voidable rests upon the trustee. 4 *Collier on Bankruptcy*, Para. 548.10, at 548–126 (L. King 15th ed. 1989). This burden of proof never shifts. However, while the burden of proof does not change during the progress of the suit, the burden of coming forward with evidence to rebut a *prima facie* case may shift. *Chorost v. Grand Rapids Factory Showrooms, Inc.*, 77 F.Supp. 276 (D.N.J.1948), *aff'd*, 172 F.2d 327 (3d Cir.1949).

### 1. *Transfer of $2.1 Million to the Shareholders*

#### a. Transfer of an Interest of the Debtor

■ The threshold requirement under § 548(a)(2)(A) is that the transfer be a "transfer of an interest of the debtor in property...." However, neither the former Bankruptcy Act, nor the current Bankruptcy Code, define what constitutes a transfer involving "an interest of the debtor in property", thereby leaving its meaning to judicial construction. As one noted commentator has observed, a transfer of an interest of the debtor must diminish the funds from which similarly situated creditors may be paid. 4 *Collier on Bankruptcy*, Para. 547.03, at 547–24 (L. King 15th ed. 1989). *See also Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1217 (9th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *Sierra Steel, Inc. v. S & S Steel Fabrication (In re Sierra Steel, Inc.)*, 96 B.R. 271 (9th Cir.BAP 1989); *In re Western World Funding, Inc.*, 54 B.R. 470, 475 (Bankr.D.Nev.1985).

■ Customarily, the existence and nature of the debtor's interest in property are determined by state law. *White v. White (In re White)*, 851 F.2d 170, 173 (6th Cir. 1988); *Luring v. Ohio Public Employees Deferred Compensation Program (Matter of Petrey)*, 116 B.R. 95, 98 (Bankr.S.D.Ohio 1990); *In re North America Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir. 1985), *cert. denied*, 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986); *In re Sierra Steel, Inc.*, 96 B.R. at 273. However, state

law must be applied in a manner consistent with federal bankruptcy law. *In re Sierra Steel, Inc.*, 96 B.R. at 273. *Id.*

Pursuant to § 541 of the Bankruptcy Code, the estate succeeds only to the title and rights in property held by the debtor. Therefore, where the debtor is in possession of property impressed by a trust which is valid under the Code, the estate generally will hold such property subject to the outstanding interest of the beneficiary. *In re H. & A. Const. Co., Inc.*, 65 B.R. 213 (Bankr.D.Mass.1986).

■ Here, the Shareholders assert that the $2.1 million transferred to them was not a transfer of an interest of the debtor in property. Suburban, argue the Shareholders, held these funds in trust for the benefit of the Shareholders since neither CTS nor, to the knowledge of the Shareholders, SDS, had a checking account. The transfer of the $2.1 million to Suburban, allege the Shareholders, created a resulting trust in their favor. They urge the Court to employ its equity powers in finding the existence of such trust. If a resulting trust is implied, the $2.1 million never became part of Suburban's estate and, therefore, there was no transfer of estate property subject to avoidance by the trustee, assert the Shareholders.

Where property of the estate allegedly is held in trust, the burden rests upon the claimant—here the Shareholders—to establish the original trust relationship. To such end, the Shareholders must (1) establish title; (2) identify the trust fund or property; and (3) trace the property in the event that the trust fund or property has been commingled with general property of the debtor. *Id.* at 216. *See also First Fed. of Michigan v. Barrow*, 878 F.2d 912 (6th Cir.1989) (any party seeking to impress a trust upon funds for purposes of exclusion from a bankruptcy estate must identify the funds in their original or substitute form); *Georgia Pacific Corp. v. Sigma Service Corp.*, 712 F.2d 962, 969 (5th Cir.1983).

Under Ohio law, a resulting trust has been defined as follows:

'[O]ne which the court of equity declares to exist where the legal estate in property is transferred or acquired by one under facts and circumstances which indicate that the beneficial interest is not intended to be enjoyed by the holder of the legal title.' 40 O.Jur. 240, § 76. The device has historically been applied to three situations: (1) purchase-money trust; (2) instances where an express trust does not exhaust the *res* given to the trustee; (3) express trusts which fail, in whole or in part. 2A *Bogart on Trusts* 405, § 451.

*First Nat'l Bank of Cincinnati v. Tenney,* 165 Ohio St. 513, 515, 138 N.E.2d 15 (1956). Thus, a resulting trust has been limited under Ohio law to express trusts which fail or do not exhaust the *res,* and to purchase-money trusts. The existence of any of these situations may create a resulting trust.

The Shareholders' argument that the $2.1 million transfer is subject to a resulting trust must fail. Clearly, there is no evidence that an express trust exists, or existed and failed. Nor is there evidence that a purchase-money resulting trust was created by the parties.[11] Once money is transferred into a debtor's corporate account, the funds are deemed property of the debtor's bankruptcy estate unless a party asserting otherwise is able to produce convincing evidence that the funds were held in a fiduciary or representative capacity. *LaRose v. Bourg Ins. Agency (In re Dick Henley, Inc.),* 45 B.R. 693, 698 (Bankr.M.D.La.1985). Succinctly stated, there is no evidence supporting the existence of a resulting trust.

Moreover, the Shareholders have not demonstrated that the $2.1 million was intended specifically for payment to the Shareholders. In fact, all other factors surrounding this series of rather unconventionally structured transactions indicate otherwise. There is no evidence, or suggestion, that the Shareholders instructed

Suburban to segregate the $2.1 million or place any legal restrictions on such funds so as to evidence non-ownership of those monies by Suburban. Thus, no third-party inspecting Suburban's bank account at that time would have been aware that some of the monies ultimately were to be distributed to the Shareholders. Suburban's apparent unrestricted use of funds and the further fact the funds were commingled with other funds are affirmative indicia that Suburban possessed a legal and equitable interest in the funds. *Berquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 96 B.R. 913, 915 (Bankr.D.Minn.1989); *In re Dick Henley, Inc.,* 45 B.R. at 697.

Similar to the case at bar, the trustee, in *Nordberg v. Sanchez (In re Chase & Sandborn Corp.),* 813 F.2d 1177 (11th Cir.1987) ("Chase & Sandborn I"), attempted to avoid an alleged fraudulent transfer under § 548 of the Code. In that case, a defunct corporation, which recommenced business under the name of the debtor, reopened its corporate checking account under its previous name exclusively for the purpose of illegally laundering funds. The court, after determining that it must "look beyond the particular transfer in question to the entire circumstance of the transactions", concluded that although the debtor had possession of the funds in controversy, the record demonstrated that it did not have sufficient control over the funds to warrant a finding that the funds were the debtor's property. *Id.* at 1180.

The court, in so holding, applied what is commonly referred to as the "control test." This test simply requires courts to step back and evaluate the totality of the circumstances to ensure that the conclusions reached are logical and equitable. *Nordberg v. Societe Generale (In re Chase & Sandborn Corp.),* 848 F.2d 1196, 1199 (11th Cir.1988) ("Chase & Sandborn II"). Adoption of this approach, the *Chase & Sandborn II* court concluded, is consistent

---

**11.** Generally, courts have found purchase-money resulting trusts to exist where a transfer of property is made to one person and the purchase price is paid by another. In such circumstances, a resulting trust arises in favor of the person by whom the purchase price is paid. 91 O.Jur.3d 251 *Trust* § 215 (1989). Here, the facts, considered in a light most favorable to the Shareholders, cannot be construed in a manner which is consistent with this meaning.

with the equitable concepts underlying the bankruptcy law. *Id. See also Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966).

Application of the control test utilized by the *Chase & Sandborn I* leads the Court to conclude that the subject sum of $2.1 million constituted property of Suburban's estate, *albeit* only for a few fleeting moments. The lack of legal restrictions placed upon the $2.1 million and the commingling of these funds with the other funds in Suburban's checking account indicate that $2.1 million was property of Suburban's estate. The $2.1 million transfer to the Escrow Account, moreover, was ordered by Suburban's president, LeGrand. LeGrand's dominion over the monies in Suburban's checking account further solidifies the Court's belief that Suburban was more than a mere conduit for the $2.1 million. Therefore, these factors viewed together confirm the Court's conclusion that the $2.1 million was property in which Suburban had a legal and equitable interest.

Having determined that Suburban possessed an interest in the $2.1 million which was transferred to the Shareholders, the Court will consider next whether the trustee has met the remaining test of § 548(a)(2)(A)–(B).

### b. Reasonably Equivalent Value

Where, as here, the trustee's claim is brought pursuant to § 548(a)(2)(A), the so-called constructive fraud provision, the trustee must prove that the "debtor ... received less than a reasonably equivalent value" in the exchange. 11 U.S.C. § 548(a)(2)(A). The language of this provision mandates two distinct requirements. First, the debtor must receive the value of the transfer, not some third party. *See Klein v. Tabatchnick,* 418 F.Supp. 1368 (S.D.N.Y.1976), *aff'd in part,* 610 F.2d 1043 (2d Cir.1979); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 136 (Bankr.D. Mass.1989). Thus, the focus is placed upon the adequacy of consideration received by the debtor, not what was given by a third party. *Ohio Corrugating Co. v. Security Pacific Business Credit, Inc. (Matter of Ohio Corrugating),* 70 B.R. 920, 926–27 (Bankr.N.D.Ohio 1987). Second, the value received by the debtor must pass a measurement test; *all* aspects of the transaction must be examined in order to calculate the value of all the benefits and burdens to the debtor, direct or indirect. *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir.1981).

The trustee contends that Suburban received no consideration in exchange for its transfer of $2.1 million to HNB, as escrow agent. According to the trustee, LeGrand transferred the Rolling Stock to TEL, and in exchange Suburban received $2.482 million. However, instead of these proceeds remaining with Suburban, LeGrand instructed Suburban's controller to issue two checks—totaling $2.1 million—to HNB for the benefit of the Shareholders, the trustee argues.

The Shareholders have not challenged this assertion. Their sole argument is premised upon their contention that Suburban's estate possesses no interest in the $2.1 million, thereby challenging the trustee's characterization of this transaction as fraudulent under § 548(a)(2). No argument has been articulated, nor evidence adduced, by the Shareholders regarding the adequacy of consideration received by Suburban in exchange for the transfer of $2.1 million to the Shareholders. Given the absence of dispute on this issue, the Court finds that no consideration was provided to Suburban in exchange for its transfer of the subject $2.1 million to HNB, escrow agent under the Contract.

And even if it were assumed, for the purpose of argument, that a resulting trust was created in favor of the Shareholders, the conclusion reached by the Court is the same: Suburban received no consideration for the transfer of its monies. The Shareholders argue that two separate and distinct transactions occurred on March 21, 1986. They assert that the Shares of SDS were transferred in exchange for $2.1 million cash and the Note, and that such transfer constituted one transaction ("Transaction I"). They further contend that TEL's

purchase of the Rolling Stock from CTS for $2.5 million constituted a second transaction ("Transaction II").

The Shareholders claim that they were unaware that the events described in Transaction II occurred at or immediately following the Closing. Specifically, the Shareholders allege that they did not learn about Transaction II until August 1986, some five months after the Closing and the merger of SDS into CTS. If one considers the transactions in this light, say the Shareholders, the conveyance was not fraudulent—they transferred the Shares to CTS and, in exchange, received $2.1 million and the Note as payment.

The trustee, on the other hand, urges the Court to view Transactions I and II as one aggregate transaction which had the overall effect of conveying Suburban's Rolling Stock to TEL without consideration. Adopting this analysis, the trustee asserts that the net effect of Transaction I and II is that Suburban transferred property, *i.e.,* the $2.1 million and the Rolling Stock, and received no property or assets of any value in exchange.

A trend has emerged in which courts analyze multi-component transfers for purposes of assaying whether adequate consideration was received by the transferor of a debtor's interest in property. *See* Cieri, *An Introduction to Legal and Practical Considerations in the Restructuring of Troubled Leveraged Buyouts,* 45 Bus.Law. 333 (Nov. 1989). Courts have looked beyond the artifice created by the parties to the essence of the transaction. By "integrating" the separate components of the larger transaction—or what is often referred to as "collapsing" the transaction—courts are able to assess the *net effect* of the series of transactions under review. *See Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988); *United States v. Tabor Court Realty,* 803 F.2d 1288 (3d Cir.1986), *cert. denied, McClellan Realty Co. v. United States,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *Wie-*

*boldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 500–03 (N.D.Ill.1988).

Therefore, even if the Court accepts the Shareholders' characterizations as true, a collapsing of the transaction demonstrates that Suburban did not receive any value in exchange for the transfer of the $2.1 million to the Shareholders or the transfer of the Rolling Stock. The Shareholders, by attempting to place the events occurring on March 21 in some discrete chronological order, would have this Court exalt form over substance. The Court must look beyond the fiction created by the Shareholders to the heart of the transaction. At bottom, Suburban transferred $2.1 million to the Shareholders and the Rolling Stock to TEL, but received absolutely no consideration in return. As to this conclusion, there is no dispute.

c. Financial Condition of Suburban

After meeting the test of § 548(a)(2)(A), the trustee must establish that the transfers and obligations resulted in, or were contemporaneous with, one of three triggering events with respect to Suburban's financial condition: (1) insolvency; (2) unreasonably small capital; or (3) an intent to incur debts beyond its ability to pay as such debts matured.[12] 11 U.S.C. § 548(a)(2)(A)–(B)(i)–(iii). Although the Code specifies that *either* of the three alternative showings satisfies § 548(a)(2)(A)–(B), the trustee maintains that he has satisfied two of the three tests: that is, the Closing left Suburban with unreasonably small capital and an inability to pay its debts as they matured.

(i) *Unreasonably Small Capital*

■■■■ The phrase "unreasonably small capital" is not defined in the Bankruptcy Code. Its meaning must, therefore, be ascertained upon a case-by-case review of the capital structure of a debtor's business. *Credit Managers Ass'n v. Federal Co.,* 629 F.Supp. 175 (C.D.Cal.1985); *Wells Fargo Bank v. Desert View Bldg. Supplies, Inc.,* 475 F.Supp. 693 (D.Nev.1978), *aff'd mem.,* 633 F.2d 225 (9th Cir.1980).

---

**12.** The Shareholders assert that "SMF [Suburban] was not insolvent or rendered insolvent by the sale of SDS". Shareholders Brief at 10.

However, the trustee has not placed the question of solvency at issue in his Third Amended Complaint or summary judgment motion.

Such an inquiry typically involves an analysis of the debtor's cash flow and available operating capital. *See Spanier v. United States Fidelity and Guaranty Co.*, 127 Ariz. 589, 623 P.2d 19 (App.1980) (insolvency as reflected by the balance sheet—*i.e.*, negative net worth—constitutes unreasonably small capital *per se*). *E.g., Credit Managers Ass'n v. Federal Co.*, 629 F.Supp. at 175; *Wells Fargo Bank v. Desert View Bldg. Supplies, Inc.*, 475 F.Supp. 693 (D.Nev.1978), *aff'd mem.*, 633 F.2d 225 (9th Cir.1980); *In re Atlas Foundry Co.*, 155 F.Supp. 615 (D.N.J. 1957); *Zuk v. Hale*, 114 N.H. 813, 330 A.2d 448 (1974). This analysis requires a court to examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financially stable. *In re Vadnais Lumber Supply, Inc.*, 100 B.R. at 137.

■ The term "unreasonably" is relative and requires judicial consideration of the overall state of affairs surrounding the corporation and the challenged transfer itself. *Barrett v. Continental Illinois Nat'l Bank & Trust*, 882 F.2d 1, 4 (1st Cir.1989). Courts' inquiries must weigh the raw financial data against the nature of the entity and the extent of the entity's need for capital during the time-frame in question. *Barrett v. Continental Illinois Nat'l Bank & Trust*, 882 F.2d at 4; *Matter of Atkinson*, 63 B.R. 266, 269 (Bankr.W.D. Wis.1986).

■ In conducting this inquiry, the Court must focus on the following problems which plagued Suburban before and after the Closing: (1) substantial operating losses; (2) inability to meet current financial obligations; (3) deteriorating banking relationships; and (4) industry-wide competition. The Court will address each problem below.

### (a) Operating Losses

The uncontradicted evidence establishes that Suburban suffered substantial operating losses prior to and after the Closing. Its pre-Closing consolidated financial state-

ments show the following operating results:

| | |
|---|---|
| 1982 income (loss) before extraordinary item— | ($1,378,746) |
| 1983 income (loss) before extraordinary item— | 197,636 [13] |
| 1984 income (loss) before extraordinary item— | ( 175,840) |

In 1985, Suburban incurred an operating loss of $1.87 million, and during the first three months of 1986 it sustained a year-to-date loss of approximately one million dollars. By the conclusion of 1986, Suburban's year-end losses totaled $3,554,994. McIntyre, upon joining Suburban as its president immediately following the Closing, testified that the current assets-to-liabilities relationship was "horrible" and expressed concern regarding Suburban's ability to pay its outstanding obligations as they came due. McIntyre Depo. p. 37, 40. In sum, the operating losses, viewed in combination with the fact that Suburban had declared an upstream dividend of all its real property, transferred its Rolling Stock and transferred a considerable amount of cash, confirms the trustee's contention that Suburban lacked sufficient capital following the Closing.

### (b) Inability to Meet Current Financial Obligations

McIntyre stated that, following the Closing, Suburban experienced turbulent relations with its trade creditors and was forced to enter into new payment terms with vendors. McIntyre Depo. p. 40. By extending payments over a longer period of time Suburban attempted to relieve some of the financial stress that had developed since the Closing. Additionally, Suburban was experiencing difficulty in paying insurance premiums, a serious concern following the Closing. McIntyre characterized Suburban's inability to meet its financial obligations as a "crisis of payment." McIntyre Depo. p. 41.

### (c) Deteriorating Banking Relationship

By the beginning of 1986, BancOhio National Bank, Suburban's principal lender,

---

**13.** As previously discussed, this figure is illusory because it reflects $500,000 in revenue which was generated from an employee wage-concession program, not from operations.

was growing apprehensive about Suburban's operating losses and its apparent inability to repay its debts as they matured. BancOhio remained troubled about Suburban's inability to service its debt, and by March 1986 the Bank refused to extend short-term financing until its $800,000 debt was paid in full. Given Suburban's precarious financial condition, BancOhio indicated its intention to terminate its lending relationship with Suburban. As one indicator of its intention, BancOhio refused to make any new loans to Suburban. As a result, Suburban's primary source of working capital had been severely impaired.

### (d) Market Competition

As previously discussed, the enactment of the Motor Carrier Act, combined with the wage and benefit levels established in its collective bargaining agreement, had a negative impact on Suburban's competitiveness and profitability. The market conditions resulting from passage of the Motor Carrier Act forced Suburban to offer shipping customers substantial discounts on established regulatory tariff prices. Such discounting resulted in a significant financial hardship to Suburban and placed even greater operating capital demands upon it. Given the highly competitive climate of the market, Suburban had an increased need for operating capital.

■ In conclusion, while some courts have looked to the specific date of an alleged fraudulent transfer in determining the capital condition of a corporation, this Court believes that such an analysis would be shortsighted; the proper application of § 548(a)(2)(A)–(B)(ii) requires a court to examine a company's capital throughout a reasonable period of time surrounding the precise date of the challenged transfer. *See Barrett v. Continental Illinois Nat'l Bank & Trust*, 882 F.2d at 4. "This approach avoids the risk of ascribing undue weight to the state of a company's balance sheet on a particular day, and allows the court to make a realistic assessment of the

impact of a transfer on a company's ability to conduct its affairs." *Id.*

The Court found the deposition testimony of McIntyre, given his experience and knowledge in the trucking industry, to be especially probative. His testimony clearly established that, after March 21, 1986, Suburban was hemorrhaging financially, and had to deal with increased competition, problems with trade vendors and a strained relationship with its primary lender. Of further significance to the Court's analysis is the fact that the Shareholders have not placed into dispute, through affidavits or otherwise, the criticality of Suburban's financial condition on and after the Closing. At this point, the Shareholders had the burden of rebutting the trustee's assertion. *Chorost v. Grand Rapids Factory Showrooms, Inc.*, 77 F.Supp. 276 (D.N.J.1948), *aff'd*, 172 F.2d 327 (3d Cir.1949). They failed to do so.

Given the Shareholders' failure to challenge the trustee's contention, the Court concludes they do not contest the trustee's assertion that Suburban possessed unreasonably small capital following the Closing. Therefore, after considering the uncontroverted evidence, the Court is persuaded that Suburban possessed unreasonably small capital at the time of the Closing, and its financial condition worsened as a result of the Closing. *See Celotex Corp. v. Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552 (the movant's burden may be discharged if the non-moving party has failed to present evidence to support an essential element of the claim).

### (ii) *Intent to Incur Debts Beyond Ability to Pay* [14]

■ Inasmuch as the Court concludes that the trustee has satisfied one prong of the three disjunctive components enunciated in § 548(a)(2)(A)–(B)(i)–(iii), it is unnecessary to consider whether the Shareholders intended to incur, or believed that Suburban would incur, debts beyond its ability to

---

**14.** There are few rulings on this particular prong of § 548(a)(2)(A)–(B), and it is rarely used by parties seeking to avoid a transfer as it appears to require the courts to undergo a subjective, rather than objective, inquiry into a party's intent. *See* Burns, *The Fraudulent Conveyance Laws and the LBO Lender*, 94 Com.L.J. 268, 293 (Fall 1989). *See also* 4 *Collier on Bankruptcy*, Para. 548.03, at 548–6 (L. King 15th ed. 1989).

pay such debts. However, given the uncontested posture of the trustee's motion and the record before the Court, it is clear that summary judgment on § 548(a)(1)(A)–(B)(iii) should be granted.

Although the record is silent as to any express intention or belief on behalf of the Shareholders that Suburban would incur debts beyond its ability to pay, the record does offer facts and circumstances from which such intention reasonably may be inferred. *See Lackawanna Parts Mfg. Co. v. Wiseman,* 133 F.2d 482 (6th Cir.1943). On several occasions preceding the March 24, 1990 transfer, the Shareholders expressed serious concerns over Suburban's financial health. The minutes of the board of directors and Shareholders' meetings are replete with references to Suburban's uncertain future viability. At a joint meeting of the Shareholders and directors of SDS, held on June 25, 1985, LeGrand warned that time was running out and Suburban would not be able to maintain operations, "under the present conditions." Trustee's Exh. 42. At a later meeting in August, LeGrand discussed Suburban's "cash flow problems" and recommended that the board authorize the sale of Suburban. Trustee's Exh. 42.

The unrefuted evidence establishes that the Shareholders were cognizant of Suburban's economic instability. Yet, despite this awareness, the Shareholders allowed Suburban's Rolling Stock to be transferred and the proceeds received therefrom to be placed in the Escrow Account for ultimate distribution to the Shareholders. As the court in *Matter of Process–Manz Press, Inc.,* 236 F.Supp. 333, 346 (N.D.Ill.1964) observed:

> Depriving a financially hard pressed debtor of $2,000,000 of working capital could have no other result than to create a belief that the debtor would incur debts beyond its ability to pay as they matured. It would require no guess work on the part of a trier of facts to find such a belief on the basis of this record. (citations omitted).

The observations noted by the *Process–Manz* court are equally applicable to the facts of the present case. The Shareholders knew that Suburban was in desperate need of operating capital. Nevertheless, they robbed Suburban of the Rolling Stock proceeds, which created an immediate inability to pay debts and caused its checking account to become overdrawn.

In light of Suburban's financial history and its sudden inability to pay its debts following the Closing, the Court finds that the Shareholders intended to incur, or believed that Suburban would incur, debts beyond its ability to pay such debts as they matured. This is not to say that this result would have been the same had the Shareholders contested this issue; however, their failure to submit *any* contradictory evidence convinces this Court that summary judgment is warranted. *Street v. J.C. Bradford & Co.,* 886 F.2d at 1480 (cases involving state-of-mind issues are not necessarily inappropriate for summary judgment).

### d. Transaction Occurred Within One Year Preceding the Petition Date

Section 548(a)(2)(A)–(B) permits the trustee to avoid a transfer which was made or incurred on or within one year before the date of the filing of the petition. There is simply no dispute that the transfers relevant to this adversary proceeding occurred within one year of February 27, 1987, the date Suburban filed its petition for relief.

### e. The Shareholders' Knowledge

■■■ The Shareholders' assertion that they had no knowledge of the sale of the Rolling Stock is irrelevant to the resolution of the issues before the Court. As previously noted, an action brought pursuant to § 548(a)(2) is presumed in law; actual intent to defraud is not a relevant factor for consideration in a § 548(a)(2)(A)–(B) analysis. *But see Kupetz v. Wolf,* 845 F.2d 842, 848 (9th Cir.1988); *Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.),* 91 B.R. 430, 439 (Bankr.N.D.Ohio 1988).[15] Imposing a requirement of scien-

15. In *Ohio Corrugating,* the bankruptcy court, while noting that the constructive fraud provi-

sions "ought to be construed as requiring some

ter would tend to render § 548(a)(1) superfluous. Absent an affirmative showing by the Shareholders that scienter is an essential element of the § 548(a)(2)(A)–(B) calculus, this Court declines to impose such a restriction.

### 2. Transfer of $125,000 to TES

The trustee, in Count I of his complaint, alleges that the $125,000 transferred to TES on March 24, 1986, constitutes a fraudulent conveyance and requests the Court to resolve summarily this issue. TES has not opposed the trustee's motion for summary judgment on this basis.[16] Although this lack of opposition, standing alone, does not automatically result in the granting of summary judgment, the Court finds, based upon the above analysis, that the trustee has produced sufficient evidence establishing the lack of a genuine issue of material fact as to this allegation in Count I of the Third Amended Complaint.

### 3. Transfer of $38,312.50 to HNB [17]

The trustee contends that Suburban transferred the sum of $38,312.50 to HNB for deposit in the Escrow Account. Apparently, these monies represent interest payments for which CTS was obligated to pay the Shareholders under the Note. The trustee asserts that the transfer of these funds by Suburban constitutes a fraudulent conveyance under § 548(a)(2)(A)–(B) of the Code.

The Shareholders have not responded to the trustee's allegations with respect to this transfer. As such, the Court finds the

degree of scienter", declined to make such a finding.

16. At the hearing on the motions for summary judgment, counsel for TES indicated that TES was a defunct entity and, therefore, would not take an active role in opposing the trustee's motion.

17. The trustee concedes that HNB is a party to this action due only to the fact that approximately $50,000 remains in the Escrow Account. As to the funds which flowed through the Escrow Account, the trustee admits that HNB functioned only as a conduit for the funds, and was not an initial transferee as contemplated by

trustee's burden has been met on this issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2514 (the non-moving party must present affirmative evidence to defeat a properly supported motion for summary judgment). After being afforded sufficient time for discovery, as required by Fed.Rule of Civ.P. 56(f), if the non-moving party does not "put up," summary judgment is proper. *Street v. J.C. Bradford & Co.*, 886 F.2d at 1478.

Based upon the foregoing, the trustee's motion for summary judgment on Count I of the Third Amended Complaint is hereby GRANTED.

### C. Shareholders' Motion for Summary Judgment

#### 1. Count II of the Third Amended Complaint

■ In Count II of his complaint, the trustee alleges that the transactions occurring on March 21, 1986, were in contravention of the Ohio Revised Code ("O.R.C.") §§ 1336.04 through 1336.07, the Ohio Uniform Fraudulent Conveyance Act.[18] Similar to their defense in Count I of the Third Amended Complaint, the Shareholders contend that the transfer of $2.1 million to them by Suburban did not violate Ohio's fraudulent conveyance law as the property transferred was not Suburban's property. However, as previously discussed, Suburban did not hold the $2.1 million as an implied trustee for the Shareholders. Accordingly, for the reasons discussed previ-

§ 550 of the Bankruptcy Code. Subsequent to the filing of the trustee's motion for summary judgment, the trustee and HNB entered into a stipulation, filed with this Court on October 15, 1990, which provides that the trustee will not seek to recover from HNB an amount in excess of the balance of the funds held by HNB, as escrow agent, less the amount of HNB's attorney's fees, which will not exceed $25,000.

18. The Ohio General Assembly enacted the Uniform Fraudulent Transfer Act ("UFTA"), which took effect on September 28, 1990. O.R.C. §§ 1366.01 to 1336.11. The adoption of UFTA had the effect of repealing the Ohio Uniform Fraudulent Conveyance Act.

ously, this argument also must fail.[19] The Shareholders' motion for summary judgment on Count II is DENIED.

### 2. *Count III of the Third Amended Complaint*

■ Count III of the complaint is based upon § 547(b) of the Bankruptcy Code. Count III seeks avoidance of the $250,000, which constituted a portion of $2.1 million transferred to the Shareholders on March 21, 1986. Section 547(b) of the Bankruptcy Code provides as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of interest in the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

In order to prevail in such an action, the movant must satisfy each element enumerated in the statute.

As an initial matter, the Shareholders posit that they are entitled to summary judgment on this count because the $250,000 was never property in which Suburban possessed an interest. However, as this Court's previous analysis indicates, Suburban did, in fact, possess an interest in these funds. The Shareholders' motion for summary judgment can be denied solely upon the ground that the transfer at issue was a transfer of an interest in Suburban's property.

The Court also notes that the record is devoid of any other evidence which sustains the Shareholders' request for summary judgment, with the exception of their unsupported assertion that the $250,000 did not constitute repayment of an antecedent debt. As such, the Court finds that genuine issues of material fact exist which must be adduced and determined at a trial on the merits. Accordingly, the Shareholders' motion for summary judgment on Count III of the Third Amended Complaint is DENIED.

### 3. *Count IV of the Third Amended Complaint*

Count IV alleges that defendants LeGrand, Thomas Losh, Marjorie Losh, and Helen Riley (collectively referred to as the "Director–Defendants"), as members of Suburban's board of directors, breached their fiduciary duties in violation of O.R.C. § 1701.59(B) by failing to act in a manner consistent with the best interests of the corporation. Specifically, the trustee asserts that by transferring the Rolling Stock to TEL the Director–Defendants engaged in a course of conduct which enhanced their personal and business interest at Suburban's expense. Count IV seeks damages arising from the breach of these Director–Defendants' fiduciary duties and any profits that they may have received therefrom.

O.R.C. § 1701.59 addresses the standard of care required by directors. It provides, in pertinent part, as follows:

(B) A director shall perform his duties as a director, including his duties as a member of any committee of directors upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interest of the corporation, and

---

**19.** The Court realizes there are substantive differences between the Uniform Fraudulent Conveyance Act and § 548 of the Code, however, as the Shareholders' argument only addressed whether the $2.1 million was estate property, these differences are not relevant to the Court's analysis.

with the care that an ordinarily prudent person in a like position would use under similar circumstances....

In Ohio, as well as other states, it is well established that a corporation's directors must act in a fiduciary capacity to the corporation. *Radol v. Thomas*, 772 F.2d 244, 256 (6th Cir.1985); *Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir.1980); *Nienaber v. Katz*, 69 Ohio App. 153, 43 N.E.2d 322 (1942). In a sense, the directors act as trustees over the corporation, administering it for the benefit of the beneficial owners, the shareholders. *Radol v. Thomas*, 772 F.2d at 258; 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 848 (1975 ed.).

■■ A director's obligation to the corporation entails two distinct duties—the duty of loyalty and the duty of care. *See Radol v. Thomas*, 772 F.2d at 256 (citing ALI, Principles of Corporate Governance: Analysis and Recommendations, Introductory Note, Part IV, at 4 (Tent.Draft No. 4, April 12, 1985)). Under the duty of loyalty, a "director shall perform his duties as a director ... in good faith, in a manner he reasonably believes to be in the best interest of the corporation," while under the duty of care, a director must perform his duties with the care that an ordinary prudent person in a like position would use under similar circumstances. O.R.C. § 1701.59(B).

■■ The Director–Defendants assert that they are entitled to judgment as a matter of law because they were not directors of SDS at the time of the Rolling Stock sale; rather, it was the directors of CTS who executed the sale of the Rolling Stock. The Director–Defendants, therefore, contend that liability premised upon O.R.C. § 1701.59(B) may not be imposed. In response, the trustee contends that the Director–Defendants' assertion that they were not directors at the time of the Rolling Stock was transferred ignores the fact that LeGrand, while president and a director of Suburban, executed the certificates of title of the Rolling Stock either to TEL or in blank.

The Court's adoption of the "collapsing" theory forecloses the Shareholders' request for summary judgment on Count IV of the Third Amended Complaint. By viewing the series of events occurring on March 21, 1986, as one integrated transaction, the Shareholders allowed Suburban's Rolling Stock to be transferred to TEL and the proceeds received therefrom to be disbursed to the Shareholders, instead of remaining with Suburban. As the court aptly noted in *Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir.1980):

> It is well accepted law that directors of a corporation occupy a fiduciary relationship to the corporation and its shareholders and are held strictly accountable and liable if the corporate funds or property are wasted or mismanaged due to their inattention to the duties of their trust. When a director breaches his fiduciary duty of trust and benefits at the expense of the corporation, under Ohio law the director is liable for any profits he received. It matters not that the director acted absent actual fraudulent intent; as long as the director places himself in a position of conflicting loyalties and subsequently violates his primary obligation to the corporation, liability attaches.

*See Ohio Drill & Tool Co. v. Johnson*, 498 F.2d 186, 191–92 (6th Cir.1974); *Seagrave Corp. v. Mount*, 212 F.2d 389, 397 (6th Cir.1954); *Nienaber v. Katz*, 69 Ohio App. 153, 43 N.E.2d 322 (1st Dist. Ct.App.1942).

Given the controlling case law, it would appear that the Shareholders' actions violated O.R.C. § 1701.59(B). The Court, therefore, is unable to find, as a matter of law, that no material facts are in dispute. The Shareholders' motion for summary judgment on this Count is DENIED.

### 4. *Count VI of the Third Amended Complaint*

■■ Count VI of the Third Amended Complaint alleges that the payment of the dividend of real property by Suburban to SDS constituted an unlawful dividend payment under O.R.C. § 1701.33. The trustee seeks the recovery of all property transfer-

red, or the value thereof, from Suburban's directors and LeGrand, as president of SDS, who authorized the dividend. Section 1701.33 of the O.R.C. provides in relevant part as follows:

> The directors may declare dividends and distributions on outstanding shares of the corporation, subject to the following provisions:
>
>> (A) A dividend or distribution may be *paid out of surplus,* however created, in cash, property, or shares of the corporation. (emphasis added).
>
> . . . .

A corporation's surplus is defined as the excess of its assets over its liabilities plus stated capital, if any. *See* O.R.C. § 1701.32.

The Shareholders contend, as a matter of law, that this transfer did not violate O.R.C. § 1701.33 as Suburban was not rendered insolvent by this transaction, nor were there reasonable grounds to believe that such payment would cause it to be rendered insolvent. The Shareholders argue that Suburban, at the time the upstream dividend was declared, had a positive net worth as reflected by its balance sheet and the market values of its property.

The trustee, however, places at issue Suburban's solvency at the time the dividend was declared. The trustee notes that Suburban's unaudited balance sheet mistakenly lists the real property, which was part of the upstream dividend, as an asset. Subtracting the value of real property from the asset side of the balance sheet equation, the trustee argues, evidences that the liabilities exceed the assets.

Clearly, the issue as to whether Suburban's assets exceeded its liabilities and, thus, whether Suburban properly declared a dividend pursuant to O.R.C. § 1701.33(A) is a material fact in dispute. Accordingly, resolution of Count VI on summary judgment is not appropriate.

### D. Pre–Judgment Interest

The trustee asserts entitlement to pre-judgment interest accruing from the commencement of this adversary proceeding. Neither the Bankruptcy Code nor Rules of Bankruptcy Procedure authorize the award of pre-judgment interest upon a § 548(a) cause of action;[20] issues involved in the awarding of pre-judgment interest have evolved through the judicial decision-making process. *See Foreman Indus., Inc. v. Broadway Sand and Gravel (Matter of Foreman Indus., Inc.),* 59 B.R. 145, 155 (Bankr.S.D.Ohio 1986). In certain circumstances bankruptcy courts have awarded pre-judgment interest based upon equitable principles. The purpose of awarding pre-judgment interest is to compensate the debtor's estate for the use of funds over the period of time they were wrongfully withheld from the estate. *Manufacturers' Finance Co. v. Marks,* 142 F.2d 521, 528 (6th Cir.), *cert. denied,* 323 U.S. 721, 65 S.Ct. 52, 89 L.Ed. 579 (1944); *Waldschmidt v. Ranier (In re Fulghum Constr. Co.),* 78 B.R. 146, 153 (M.D.Tenn. 1987) (quoting *Turner v. Japan Lines, Ltd.,* 702 F.2d 752 (9th Cir.1983)) *rev'd on other grounds,* 872 F.2d 739 (6th Cir.1989); *Matter of Foreman Indus., Inc.,* 59 B.R. at 155. The granting of pre-judgment interest is a compensatory remedy. *Matter of Foreman Indus., Inc.,* 59 B.R. at 155.

The bankruptcy court is vested with the discretion to award pre-judgment interest. *Dery v. United States (In re Bridge),* 106 B.R. 474, 477 (Bankr.E.D. Mich.1989). Initially, pre-judgment interest was awarded only in preference actions.

---

**20.** The Code section often cited as giving authority to the bankruptcy courts for awarding interest in fraudulent conveyance actions is 11 U.S.C. § 550(a). In pertinent part, this section provides:

> [E]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549 or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, *the value of such property,* . . . (emphasis added).

Generally, courts rely upon the reference to "value," an undefined term in the Code, as giving the authority to award interest. *See In re Art Shirt Ltd., Inc.,* 93 B.R. 333, 341, n. 9 (E.D. Pa.1988); *In re H.P. King, Inc.,* 64 B.R. 487, 489, n. 1 (Bankr.N.D.N.C.1986); *In re Production Steel, Inc.,* 60 B.R. 4, 5 (Bankr.M.D.Tenn.1986).

However, the judicially-developed guidelines favoring pre-judgment interest in preference proceedings are equally applicable in fraudulent conveyance actions. *Id.; Accounting Services Co. v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118, 127 (D.Utah 1986). *But see Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 741–42 (1st Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983) (the circuit court approved the rule awarding pre-judgment interest from the date of commencement of the action, but declined to award interest in a proceeding to recover a fraudulent conveyance under the Act [11 U.S.C. § 107(d)(2)] because the property conveyed did not have a definite and ascertainable value.) Pre-judgment interest in both preference and fraudulent conveyance litigation accrues from the date of the demand on the defendant, or absent demand from the date the adversary proceeding was filed. *Kaufman v. Tredway*, 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904); *Matter of Foreman Indus., Inc.*, 59 B.R. at 156; *In re Southern Indus.*, 87 B.R. 518, 522 (Bankr.E.D.Tenn. 1988); *Shaver Motors, Inc. v. Mills (In re Mills)*, 111 B.R. 186, 208 (Bankr.N.D.Ind. 1988).

The controlling law in the Sixth Circuit allows the awarding of pre-judgment interest once the court finds that such an award is appropriate. The majority of courts which have addressed this issue grant pre-judgment interest at the rate described in 28 U.S.C. § 1961. These courts concluded that Congress favors the awarding of pre-judgment interest in a federal court where the surrounding circumstances warrant such interest.[21]

. . . .

Section 302 amends 28 U.S.C. [§] 1961 by setting a realistic and national rate of interest on judgments in the federal courts. The provision would tie the post-judgment interest rate to the rate used by the Internal Revenue Service for delinquent taxes under 26 U.S.C. [§] 6621. That rate is a composite of prime rates from throughout the country that is reviewed and revised periodically. Furthermore, by consolidating all provisions for interest on judgment of title 28 into this section, this rate becomes uniformly applicable to all litigation in Federal courts.

There are presently no general applicable guidelines concerning the award of pre-judgment interest by Federal courts. Yet such interest may be essential in order to compensate the plaintiff or to avoid unjust enrichment of the defendant. For instance, a plaintiff who was unlawfully deprived of the use of $20,000 in 1976, and who did not receive a judgment until 1979, could have obtained $4,500 in the three-years intervening period by investing the money at 7% compounded interest.

*Matter of Foreman Indus.*, 59 B.R. at 157 (quoting S.Rep. No. 275, 97th Cong., 2d Sess. 30 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News pp. 11, 40 discussing § 302 of the Federal Courts Improvement Act of 1982, P.L. 97–164, 96 Stat. 25).

The Sixth Circuit, in *dicta*, has suggested its preference for the adoption of the statutorily-defined rate set forth in § 1961(a).[22] Accordingly, this Court finds that an award of pre-judgment interest is appropriate from the date this adversary proceeding was commenced by the trustee. Such pre-judgment interest shall be computed in accordance with the provisions of § 1961. Pursuant to this provision, the post-judgment interest rate is calculated at a rate equal to the coupon issue yield of a

21. Neither 28 U.S.C. § 1961, which establishes *post*-judgment interest rates, nor any other federal statute set forth the applicable guidelines concerning the award of *pre*-judgment interest in federal courts. *In re Mills*, 111 B.R. at 209 (emphasis in original); *In re H.P. King*, 64 B.R. at 491. Typically, federal courts have found that the appropriate rate for post-judgment interest in § 1961 is equally applicable to pre-judgment interest, absent "substantial evidence" showing "that the equities of the particular case require a different rate." *Id.* at 491.

22. In *EEOC v. Wooster Brush Co. Employees Relief Assoc.*, 727 F.2d 566, 579, the Court noted that "[U]ndoubtedly in the future, district courts may be influenced by the congressional wisdom expressed in the amendment of 28 U.S.C. § 1961(a)."

52–week Treasury Bill set immediately prior to entry of the order. *See Rafoth v. Bailey (In re Baker & Getty Financial Services, Inc.),* 88 B.R. 792, 880 (Bankr.N. D.Ohio 1988).

## V. CONCLUSION

Based upon the foregoing, summary judgment is granted in favor of the trustee on Count I and against the Shareholders on Counts I, II, III, and VI of the Third Amended Complaint. The Director–Defendants'_request for summary judgment on Count IV of the complaint also is DENIED.

The parties are hereby ordered to supplement their pre-trial statements and to file a jointly proposed pre-trial order. The proposed order should include the issues left for trial, and pertinent pre-trial cutoff dates, and further should include a statement of trial exhibits that can or will be subject to admission by stipulation. The parties also should include therein a statement as to the time needed for trial and the date by which they will be prepared to proceed to trial. Finally, the parties must update their list of witnesses and exhibits. The supplemental pre-trial statement and pre-trial order must be filed with the Court no later than January 18, 1991.

IT IS SO ORDERED.

## AMENDED JUDGMENT ENTRY

Judgment in the above-captioned adversary proceeding is hereby entered in favor of the plaintiff and against the defendants pursuant to the Opinion and Order dated December 19, 1990. The Court finds there is no just reason for delay and final judgment shall be entered against the following parties in the respective amounts, which include prejudgment interest at the rate of 7.22% per annum, compounded from September 28, 1987, through December 20, 1990:

| | |
|---|---:|
| William Sexton | $ 65,721.20 |
| Joanne S. Bagby | 38,674.29 |
| Lawrence K. LeGrand | 319,066.00 |
| Patricia Ann Holland | 23,217.36 |
| Mary Sharon Logan | 23,217.36 |
| William M. Holland, III | 23,217.36 |
| Thomas J. Holland | 23,217.36 |
| Marjorie Losh | 92,849.38 |
| Susan Kollar | $ 4,630.19 |
| James C. Losh | 4,630.19 |
| Susan D. Kollar, Custodian Ryan, Eric, and Christopher Kollar | 2,908.44 |
| Thomas C. Losh | 23,182.30 |
| Huntington National Bank, Trustee of the Estate of James R. Riley | 1,448,244.00 |
| Huntington National Bank, Escrow Agent | 60,678.03 |
| Transportation Equipment Services, Inc. | 156,636.00 |

Interest shall accrue on each account listed above at the rate of 7.02% per annum, compounded annually, from December 21, 1990.

IT IS SO ORDERED.